**TOWN OF NORTH BONNEVILLE, WASHINGTON**

v.

**The UNITED STATES.**

No. 564–80C.

United States Claims Court.

May 11, 1984.

James J. Mason, Tacoma, Wash., for plaintiff.

Fred R. Disheroon, Washington, D.C., with whom was Acting Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

HARKINS, Judge.

Plaintiff, Town of North Bonneville, (Town) filed its petition in the United States Court of Claims on October 20, 1980, to obtain a judgment of $14,500,000 for breach of two agreements in a series of instruments that were concerned with relocation of the Town as part of the project to construct a second powerhouse at Bonneville Dam. On November 19, 1982, defendant filed a counterclaim for $13,400,000. The counterclaim included compensation for expenses incurred in the construction of additional municipal facilities, costs in-curred to operate and maintain city and municipal facilities from 1978 to 1982, and damages that resulted from unlawful delays allegedly caused by the Town.

The case was transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982. 28 U.S.C.A. § 171, note (1983). The case is before the court on plaintiff's motion for partial summary judgment, filed April 29, 1983, and defendant's cross-motion for summary judgment, filed May 2, 1983. Oral argument was heard on October 27, 1983. Pretrial preparation of matters relative to disposition of defendant's counterclaim have been suspended pending disposition of defendant's cross-motion for summary judgment.

The essential facts relative to liability issues are not in dispute and those issues may be decided through summary judgment procedures. This case involves a course of dealings between a municipal body and the Federal government over a protracted period that is embodied in a series of documentary exhibits. Plaintiff's motion is supported by two exhibits and an affidavit, each with multiple attachments, and plaintiff's response to defendant's cross-motion is supported by an additional 61 exhibits. Defendant's cross-motion is supported by seven exhibits.

The issues that now must be determined are (1) the construction of the terms of certain instruments, and (2) whether those instruments are contracts within the scope of the jurisdiction conferred on this court by 28 U.S.C. § 1491(a)(1) (1982). An examination of the factual background in considerable detail is required to resolve contract construction issues. For the reasons that follow, plaintiff's motion for partial summary judgment is allowed.

The Town of North Bonneville was a boom town that originated with the Bonneville Dam project; it reached a peak population of 643 in 1940, during the dam's construction period. Bonneville Dam, on the Columbia River, was authorized in 1935

and completed in 1943. It was constructed and is operated and maintained by the United States Army Corps of Engineers (Corps). The northern half of the spillway of the dam is in the State of Washington; the southern half of the spillway, and the first powerhouse, navigation lock and other facilities are on the Oregon side of the river.

In 1965, the Bonneville Power Administration, which markets power generated by the dam, requested construction of a second powerhouse. The site ultimately selected included approximately 95% of the then existing Town of North Bonneville, and in August 1971, the Town was notified that the United States intended to acquire that area.

The Town's population in 1971, including areas outside the corporate limits, was estimated at 650 persons. In 1972, revenues from general property taxes amounted to $5,997; municipal receipts from all sources amounted to $51,250. Without the prospect of a second powerhouse at the Bonneville Dam and possible town relocation, it is probable that the Town within the original corporate limits would have experienced a stable population of from 550 to 650, and that the entire community area would have a population of from 750 to 850. The total holding capacity of the existing town, without the second powerhouse or relocation, assuming ultimate possible development, was projected, as of June 1975, at 554 lots and a total of 1,528 people.

Completion of the second powerhouse project necessitated the removal of substantially all of the residences, businesses, municipal utilities and facilities of the Town. The Town's officials and citizens indicated a desire to be relocated as a community, rather than for the residents to be relocated individually under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Policies Act). Pub.L. No. 91–646, 84 Stat. 1894 (codified at 42 U.S.C. §§ 4601 et seq. (1976 & Supp. V 1981)). On September 20, 1971, the Town hired a planning consultant to prepare a preliminary engineering report on existing municipal facilities and relocation items. The consultant's November 22, 1971, report estimated that a relocated town would have a total population of from 700 to 750 people by 1981, and that the approximate total cost for the construction of · new municipal facilities would be $5,600,000. The site recommended by the planning consultant was substantially the same as the site ultimately chosen.

The Town lacked financial capability to continue its planning effort, and in order to clarify the authority of the·Corps to participate in planning for relocation of the Town and for construction of municipal facilities in the relocated town, the Town sought additional legislative relief. In testimony before the Subcommittee on Water Resources, of the House Public Works Committee, in 1973, on H.R. 8756, a bill to provide assistance to the Town of North Bonneville, Washington, in planning a new town and for other purposes, the Town manager requested an allocation of resources to facilitate comprehensive planning for relocation before actual building of the second powerhouse. He estimated that the planning, acquisition and move of the Town would be in "the neighborhood of $1.5 million." Hearings, p. 1225.

Pub.L. No. 93–251, Section 83 (88 Stat. 35) was enacted on March 7, 1974 (hereinafter Section 83). It modified the Bonneville Project Act (Aug. 30, 1936, 49 Stat. 1028 and Aug. 20, 1937, 50 Stat. 731) so as to authorize the Corps to relocate the Town to a new townsite.

After Section 83 was enacted, representatives of the Corps and of the Town undertook extensive planning and relocation activities, which included negotiations and the sequential execution of a series of written instruments. These included:

1. A cost reimbursable planning agreement, labeled Contract for Services (DACW57–75–C–0032), dated July 26, 1974, in which the Corps initially allocated $341,529 for the Town to employ the services of a planning consultant, subject to approval of the Corps' contracting officer, to proceed with studies, investiga-

tions, environmental reports, development of site plans, estimates of costs, and all other items necessary for planning for relocation. This contract was amended by a supplemental agreement on October 14, 1974, to provide that the Draft Feature Design Memorandum (DFDM) to be prepared by the planning consultant would include as a basic element that replacements for municipally owned facilities and utilities would have the same capacity and be able to serve the same number of users as those in the existing town.

2. A Contract for Professional Services, dated November 19, 1974, between the Town and the firm of Royston, Hanamoto, Beck & Abey (RHBA). This contract, approved by the Corps on November 19, 1974, provided the Town would pay RHBA $739,761.32 for the work, and recited that the Town would be reimbursed by the Corps pursuant to the July 26, 1974, Contract for Services. RHBA's obligation was to perform the services that were defined in the July 26, 1974, contract as amended, and in the scope of work attached. The scope of work statement had been prepared jointly by the Town and the Corps.

3. A Memorandum of Agreement between the Town and the Corps, dated May 23, 1975, which stated its purpose was "to set forth current understandings, agreements, and planned actions and procedures and relationships between" the Town and the Corps in regard to the relocation of the Town under the provisions of Section 83.

4. Contract No. DACW57–76–C–0039, a contract for relocation—replacement, rearrangement and/or alteration of facilities, dated August 19, 1975 (Relocation Contract). The contract estimated the cost of the Town's move, with the associated cost for railroad and highway relocations, to be approximately $14 million. The contract recited that the Town and the Corps had agreed on the general concept for the development of design of the new townsite and that the preliminary master plan and general design con-

cept had been set forth in Design Memorandum No. 8 dated June 1975. Design Memorandum No. 8 had been delivered by the Town to the Corps designated as the DFDM required by the July 26, 1974, planning contract. The Corps agreed to administer the design contract, and to secure the services of the architect/engineer contractors; the scope of work provisions of the design A/E contract were to be subject to the Town's written approval.

5. The Architect/Engineer firm of Daniel, Mann, Johnson, Mendenhall/Hilton was selected as the design A/E contractor. Final approval of the Scope of Work for the design contract was signed by the Town on July 10, 1975; the Corps' concurrence is indicated by the signature of the Corps' District Engineer, and the Town initialed for receipt of concurrent signature on October 7, 1975.

In general, in these sequential instruments the parties would incorporate by reference relevant provisions of the preceding instruments. The instruments also included standard provisions for Government contracts, and, typically, incorporated numerous attachments by reference. There is no dispute that the written instruments were in fact properly executed by the parties; and there is no dispute that the signatories were representatives who had authority to sign the instruments.

On May 21, 1975, the Town Council enacted Ordinance No. 285, which enacted a business and occupation tax of one-tenth of one percent (.001) on persons engaged in some activities, and taxed other activities at the rate of one-half of one percent (.005). On December 23, 1975, Ordinance No. 285 was amended to tax all activities one-half of one percent (.005). This tax applied to contractors with the United States who were involved with the construction of the second powerhouse.

On February 24, 1976, the Town Council enacted Ordinance No. 306, which annexed to the existing Town the real property upon which the new town was to be relocated.

The Town's jurisdictional boundary includes the area of the original townsite, which is now the location of the second powerhouse, and the area of the Town's planned relocation.

The United States began acquiring properties in the Town in 1974. It has acquired land in the relocation area, and has planned, designed and constructed substitute municipal facilities, and a central sewage collection and treatment facility that the original Town did not have. All private owners of property acquired by the United States received just compensation for their property and other benefits pursuant to the Policies Act. Qualified residents were given the opportunity to purchase land in relocation areas directly from the Corps. Eligible residents who were to be relocated were given rent-free interim housing during the construction period. Substantially all of the new townsite and municipal facilities and utilities were completed by September 1978. Beneficial occupancy of the city hall and the fire station was given in March 1978, and of the water system later in 1978. The Corps has refused to convey to the Town two parcels which it owns, and the Corps has not acquired for conveyance to the Town a parcel it does not own. These parcels were designated in the Relocation Contract for the optimum (expansion) area outside the relocated initial town boundaries. The Corps, as of June 30, 1979, had expended $33,117,000 to relocate the Town.

---

During the planning and relocation negotiations, numerous disputes arose. Both parties have initiated litigation in the District Court for the Western District of Washington to supplement their negotiating positions. The Town states that, in connection with the Section 83 relocation, it has been required to litigate 18 lawsuits.

In August 1974, a disagreement arose as to the extent of the Corps' authority to provide municipal facilities under Section 83. The Town construed the authority to mean that the new municipal facilities should have the same capacity as the facilities in the existing town; the Corps interpreted the authority to mean that it could only provide new facilities for persons who actually relocated. After the Town sought a declaratory judgment in the Western District of Washington (*Town of No. Bonneville v. United States*, No. C74–133T), the Corps' District Engineer acquiesced, the planning agreement was amended on October 14, 1974, and the suit was dismissed on October 22, 1974.

In April 1975, the Town sought declaratory and injunctive relief in the Western District of Washington to obtain a construction of the term "fair market value" as used in the July 26, 1974, planning contract and an injunction against all construction activity until the environmental impact statement complied with the NEPA. 42 U.S.C. §§ 4321 et seq. (1976 & Supp. V 1981). This case aroused the interest of the Washington and Oregon Congressional delegations and, after the parties negotiated the May 23, 1975, Memorandum of Agreement and the August 19, 1975, Relocation Contract, it was abandoned. *Town of No. Bonneville v. Callaway*, No. C75–81T (W.D.Wash. Sept. 24, 1976).

On March 29, 1977, the United States sought declaratory relief, and an interpretation of Section 83 and the provisions of the August 19, 1975, Relocation Contract, in the district court (No. C77–56T). The United States sought a declaration that, under Section 83, the United States has no authority to provide the Town with a new federally constructed town on a new site unless the Town correspondingly gives up jurisdiction over the area that will be used for the powerhouse, and a declaration that the Town does not have power, under Washington State law, to acquire and hold lands for expansion of their boundaries or for speculation.

In other litigation related to eligibility criteria for commercial relocation lots under the Relocation Contract, the Town on December 16, 1977, obtained a temporary order that restrained the Corps from proceeding with selection of commercial lots by a lottery process. *United States v.*

*Town of No. Bonneville,* No. C76–260T (W.D.Wash.Dec. 16, 1977). Third parties who were property owners in the Town and who could be injured by further delay in lot selection, brought a class action in which the Town and the United States were named as defendants. *Miller v. Peel,* No. C77–278T (W.D.Wash.1977). In the *Miller* case, the plaintiffs asserted claims to lots pursuant to the provisions of Section 83 and the Relocation Contract. At a hearing on July 14, 1978, the district court requested counsel to submit stipulated issues for decision. Five issues were submitted: Issues I, II and III related to criteria to be applied in order to determine those eligible to become commercial relocatees to the new Town; Issue IV related to the possibility of conflicts among potential commercial relocatees; and Issue V related to the standing of the Town to raise these issues. On August 9, 1978, the district court ruled Issue IV was premature, Issue V was unnecessary, and decided Issues I, II and III, as follows:

4. With respect to Issues I, II, and III, the Court finds the standards of eligibility for commercial relocatees set forth in article V, paragraphs 2.02 and 2.05 of the Relocation Contract to be fully controlling. This finding is made in light of the express mandate in the McCormack Act, Public Law 93–251, Sec. 83(d), 88 Stat. 35, that such a contract be entered into; and in light of article V, paragraph 3.01, of the Relocation Contract which expresses the parties' intention that the Contract satisfy the statute. Eligibility to select a commercial lot requires that the applicant satisfy all the conditions set forth in paragraphs 2.02 and 2.05 of the Relocation Contract.

*Miller v. Peel,* No. C77–278T (W.D.Wash.).

On September 14, 1979, the district court entered a final order in which it addressed the argument that sales of commercial lots to the Town under the Relocation Contract were prohibited by the Washington State Constitution. The court found "there is no legal impediment to the purchase of the unselected commercial lots by the Town of North Bonneville."

On November 13, 1979, the United States filed its notice of appeal in *Miller v. Peel* (No. C77–278T). In February 1980, the federal appellants requested suspension of the appeal pending decision by the Washington State Supreme Court on questions that had been certified by the district court in *United States v. Town of No. Bonneville* (No. C77–56T). The request for suspension was allowed, and the suspension was extended to March 23, 1981. *Miller v. Peel,* No. 79–4805 (9th Cir. Nov. 17, 1980).

Case No. C77–56T had been referred to a magistrate, who on April 10, 1980, reported that the following facts were stipulated:

1. The United States of America has acquired and owns in fee simple those optimum town segments lying southerly of the initial town, as shown on the Final New Town Plan, Town of North Bonneville, Washington, dated November 30th, 1975.

2. The Town of North Bonneville has made a timely request in proper form, pursuant to the contracts between the parties, for the United States of America to acquire the optimum town area and to sell it to the Town as provided in such contracts.

3. The United States of America has refused to comply with such request on the ground that the Town may not, under the Constitution of Washington, acquire such property with the intent of reselling part of it to private parties, the identity of whom is not known.

The magistrate's recommendation, which was approved on April 14, 1980, was that the following questions be certified to the Supreme Court of Washington:

1. Whether the City of North Bonneville, an optional code city under the laws of the State of Washington, as part of the relocation of the residents and businesses is authorized to purchase land for the purpose of devoting such property to both public and private uses including the platting of a portion thereof into streets and lots and sale or lease of lots to unidentified private parties according

to the general concept such as that shown on the Final New Town Plan, Town of North Bonneville, Washington attached.

2. Whether the acquisition of such lands with the intent of the part of the city to resell the platted lands to unidentified parties constitutes an unlawful loan of municipal credit in violation of Article 8, Section 7 of the Constitution of the State of Washington.

On December 18, 1980, the Supreme Court of Washington declared:

> For the reasons stated above, therefore, we answer the United States District Court for Western Washington by declaring that the proposed land acquisitions are within the town's authority and that the land transactions do not violate article 8, section 7 of the Washington State Constitution.

*United States v. Town of No. Bonneville,* 94 Wash.2d 827, 621 P.2d 127, 133 (1980).

On February 17, 1981, the appeal in *Miller v. Peel,* (No. C77–278T, App. No. 79–4805) was dismissed on appellee's motion for summary affirmance. The Ninth Circuit order stated the sole issue in the appeal was the legal capacity of the Town to purchase the subject land from appellants, and that the Supreme Court of Washington had decided this question adversely to appellants.

### DISPOSITION

Plaintiff's motion for partial summary judgment seeks a determination that the May 23, 1975, Memorandum of Agreement, and the August 19, 1975, Relocation Contract are valid and enforceable. Defendant's motion for summary judgment asserts that the Memorandum of Agreement and the Relocation Contract are not binding by their own terms, that any obligation of the United States to the Town is not greater than set out in Section 83, that Section 83 did not authorize contractual commitments that conferred substantive rights additional to a claim for just compensation for the taking of the Town's properties, and that the instruments cited by the Town are not contracts cognizable under this court's Tucker Act jurisdiction. 28 U.S.C. § 1491(a)(1) (1982). Defendant's jurisdictional arguments are discussed first.

■ Authority to acquire a site for the second powerhouse is contained in the Bonneville Project Act. 16 U.S.C. § 832 (1982). The Corps' authority under the Act includes the ability to furnish substitute facilities to compensate municipalities when public facilities are taken. *Brown v. United States,* 263 U.S. 78, 83, 44 S.Ct. 92, 94, 68 L.Ed. 171 (1923). The substitute facilities rule, however, does not provide an adequate basis for the Corps to furnish financial assistance to plan and design a new site and to construct new municipal facilities based on projected expansion in a relocated town.

The 1968 criticism by the Comptroller-General of the Corps' relocation agreements that compensated replacement of municipal facilities which were based on arbitrary expansion allowances, coupled with the Town's need for financial assistance for planning and design of a relocated community, stimulated representatives of both the Town and the Corps to petition Congress for the additional, supplement authority that is provided by Section 83. Additional authority was needed to permit the Corps to provide financial assistance to the Town for its planning and design costs for a new townsite, and to compensate the construction of municipal facilities that were not authorized under the substitute facilities rule.

Section 83 specifically authorizes the Secretary of the Army "to relocate the Town of North Bonneville, Washington, to a new townsite." As part of the relocation, the Secretary was authorized "to cooperate in the planning of a new town" with Federal and non-Federal interests, to acquire lands "necessary" for the new town, and to "convey title to said lands to individuals, business or other entities, and to the town as appropriate." Municipal facilities provided under Section 83 were to be "substitute facilities which serve reasonably as well as

those in the existing town," but were to be constructed to such higher standards as may be necessary to comply with applicable Federal and State laws. Additional municipal facilities, or higher standards, were authorized, but "only at the expense of non-Federal interests." Appropriate contractual instruments were expected to be used. Section 83(d) provides that before the Secretary acquires any real property for the new townsite, "appropriate non-federal interests shall furnish binding contractual commitments that all lots in the new townsite" will (1) be occupied, (2) be replacements for open space and vacant lots in the existing town, or (3) "be purchased by non-Federal interests at the fair market value."

Defendant argues that even if it is assumed the Memorandum of Agreement and the Relocation Contract reflect agreements between the parties, this court cannot render a judgment because such agreements are not the type or class that are covered by the Tucker Act jurisdiction in 28 U.S.C. § 1491(a)(1). Defendant recognizes that in 28 U.S.C. § 1491(a)(1), Congress has waived the sovereign immunity of the United States for the classes of claims identified. Defendant asserts, however, there is no other source of law that creates an entitlement to the monetary damages claimed by plaintiff. *Mitchell v. United States*, 51 U.S.L.W. 4999 (U.S. June 27, 1983) (*Mitchell II*).

Defendant cites *Kania* for the proposition that contract liability enforceable under the Tucker Act does not extend to every agreement, understanding or compact which can semantically be stated in terms of an offer, acceptance or meeting of minds. *Kania v. United States*, 227 Ct.Cl. 458, 650 F.2d 264, *cert. denied*, 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). In *Kania*, the Court of Claims dismissed a contract action in which the breach of contract was shown by the dismissal of an investigation that had been secured on the ground that the Government had promised immunity from prosecution in exchange for testimony before a grand jury. The Court of Claims reasoned that, although it was possible to make a binding contract that created a liability for breach of a plea bargaining agreement, or one to grant immunity for giving testimony, there must be a showing of specific statutory authority to make such an agreement that would obligate the United States to pay money.

Defendant contends the rational of *Kania* applies to the Town's relocation claims because no provision of the documents at issue purport to confer any entitlement to monetary damages. Defendant states that the authority for the contractual instruments is limited to the provisions of Section 83, and that subsection (c) of the statute excludes any compensation that goes beyond the right of the Town to just compensation.

■ Defendant's argument does not take into account the distinction between claims based upon breach of an authorized contract and claims founded upon the Constitution, a statute or a regulation. The Tucker Act jurisdiction in 28 U.S.C. § 1491(a)(1) authorizes the Claims Court to render judgment upon any claim that is founded either on the Constitution, or any statute or regulation of an executive department, or is founded upon any express or implied contract. Where the claim is based upon the Constitution, a statute or a regulation, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal government for damages sustained. *Mitchell II*, 51 U.S.L.W. at 5003. Where Congress has given specific authority to Federal officials to negotiate and enter contracts on behalf of the United States, however, a court is not required to make further inquiry to determine whether the source of substantive law separately mandates compensation. Where such contract has been made, a claim founded upon a breach is cognizable in this court. In such a case, the law of contracts mandates the compensation the United States is obligated to pay for its breach.

■ In *Kania* the Court of Claims outlined the indicia that distinguish the type of Government contracts that are cognizable

under the Tucker Act from those Congress has withheld its waiver of sovereign immunity. In general, contracts made by Government officials in the implementation of a sovereign function are not amenable to suit in the Claims Court; on the other hand, contracts made in situations where the Government enters the market place in a proprietary capacity are subject in this court to claims for breach. *Kania v. United States,* 650 F.2d at 268.

The Memorandum of Agreement and the Relocation Contract do not fit neatly into either class. The contracting parties are governments and the Town's relocation is a subordinate phase of the United States' assertion of its sovereign power of eminent domain under the Bonneville Project Act. Defendant asserts the Corps was clearly acting as a sovereign, that this litigation involves purely questions under the law of eminent domain, and that case law applicable to contracts is inappropriate.

The contracts between the Corps and the Town are not identical with the class of contracts where the sovereign engages in the purchase or sale of goods, lands or services, or other transactions that compare with contracts between private parties. Plaintiff points out, however, that the Memorandum of Agreement and the Relocation Contract are concerned with the purchase and sale of lands, goods and services in a manner that is normal in contracts municipalities make with public utilities. If the Bonneville Dam and its second powerhouse were owned and operated by a private electric company, as similar projects are, plaintiff asserts, the Town and the private owners may well have made very similar contracts.

On balance, the Town's arguments are persuasive. By Section 83, the Corps was authorized to relocate the Town to a new townsite and in the process to acquire lands necessary for the new town and to construct necessary municipal facilities. The authority granted in Section 83 supplements the powers conferred in the Bonneville Project Act, and Section 83 specifically authorizes the class of contractual relationships here at issue between the Corps and the Town.

■ Defendant's reliance on Section 83(c) as a restriction on the Town's remedy in the relocation program to just compensation, as distinguished from monetary damages for breach of contract, ignores the class of contractual relationships that Sections 83(a), 83(b) and 83(d) intended to be entered. It is concluded that the Memorandum of Agreement and the Relocation Contract are included in the class of contracts subject to this court's jurisdiction under 28 U.S.C. § 1491(a)(1).

Defendant contends that the Memorandum of Agreement and Relocation Contract by their terms, never effectively created any legal obligation on the part of the United States. First, because both required adoption by Congress of certain clarifying language, and secondly, because both were preliminary understandings relative to future procedures.

Article 14, labeled "Condition Precedent" in the Relocation Contract provides:

> The obligations of the parties herein contained are subject to the adoption by the Congress of the clarifying language contained in House Report 94–319; pages 50 and 51 by attachment to appropriate legislation.

Similarly, paragraphs 2 and 12 of the Memorandum of Agreement contained provisions that made the memorandum subject to the adoption of certain clarifying language.

House Report 94–319 was filed on June 20, 1975; and the Relocation Contract was executed on August 19, 1975. From this time sequence, defendant argues that the parties clearly intended more than the inclusion of language in the committee report to satisfy the condition precedent and to clarify the meaning of Section 83. Defendant equates the phrase "adoption by the Congress" with enactment of clarifying language by an amendment of Section 83. Defendant is in error with respect to the Congressional action the parties intended by the phrase "adoption by the Congress."

Both the Relocation Contract and the Memorandum of Agreement were subject to the condition that Congress adopt clarifying language. The structure of these agreements and of the documents incorporated by reference, in the light of the chronology of the parties' actions relative to the contract provisions, makes it clear that the phrase "adoption by the Congress" means: (1) inclusion of certain language in the House and Senate committee reports on H.R. 8122, the Public Works Appropriations Act for Fiscal Year 1976, and (2) the subsequent enactment of the appropriations recommended in those reports. The reports contain the language and the FY 1976 appropriations were enacted. Pub.L. No. 94–180, 89 Stat. 1035 (1975). Accordingly, the condition to which these contracts were subject has been satisfied.

The chronology makes this clear:

(1) By early 1975 a number of differences between the parties had developed in the planning of procedures for the Town's relocation pursuant to Section 83. In April 1975, the Town brought an action in the Western District of Washington (Civ. No. C75–81T) to obtain declaratory relief and an injunction from all construction activities of any nature in the existing town pending preparation of an environmental impact study.

(2) On April 30, 1975, members of the Washington and Oregon Congressional delegations met with representatives of the Town and the Corps to discuss construction of the second powerhouse and relocation of the Town.

(3) On May 6, 1975, a letter signed by members of both congressional delegations advised the Corps that "no delay in the powerhouse construction schedule can be tolerated"; that "a Memorandum of Relocation should be signed by June 1"; that "we stand ready to propose report language to the House and Senate Appropriations Committees for inclusion in their Reports on the FY 1976 Public Works Appropriations Act"; and that "we will seek to obtain written assurances from the Public Works Appropriations Subcommittee Chair-

man prior to June 1st, that they will support inclusion of the language in their reports."

A memorandum attached to the May 6 letter set out five steps which "we feel should be followed." It had the following preamble:

*Objective to be Obtained*

Before May 30, the Corps and the Town sign the Memorandum of Relocation. In the Memorandum, the Corps agrees to take specific actions (step 1 below) required by the Town. The Corps further agrees to take those actions by a time certain following enactment of the Public Works Appropriations Act into law. In the same Memorandum the Town agrees to take no action in court or otherwise to halt construction of the Powerhouse or the Town relocation provided the Corps takes the actions (step 1 below) required by the Town by the time certain. The Town further agrees to withdraw its present court suit.

(4) Paragraph 12 of the May 23, 1975, Memorandum of Agreement, labeled "Execution of Relocation Contract" incorporated the May 6, 1975, letter by reference. It also states that the Town and the Corps agree the "understandings and agreements herein documented substantially confirm to the requirements for a 'Memorandum of Relocation' as referred to" in the May 6, 1975, letter. Paragraph 13 of the Memorandum of Agreement stated the Town "agrees to withdraw its present court suit and to withhold all legal action against the Corps of Engineers between the date of signing this Memorandum and the date of passage of the said FY 76 Public Works Appropriations Act into law."

(5) On June 3, 1975, the Corps notified Representative McCormack that the Memorandum of Agreement had been signed and that this agreement "resolves the remaining issues between the Town and the Corps." The June 3, 1975, letter emphasized that in order for the second powerhouse project to remain on schedule (power-on-line by May, 1981), the relocation con-

tract must be consummated by 18 June 1975, and stated:

> For these reasons, I am pleased to report that in the Memorandum of Agreement the Town has agreed to withdraw the suit it had filed in Federal District Court for western Washington. The Town has further agreed to forgo any other court action until Congress acts on the FY 76 Public Works Appropriation in the hope that the attached report language will be approved.

(6) In the district court action, the Town on June 2, 1975, had requested that a hearing be scheduled for June 27, 1975. On June 10, 1975, the Corps' district counsel notified the Town that it did not expect passage of the FY 1976 Public Works Appropriations Act until the latter part of August or the first part of September, and requested the hearing be "set over until the Town and the Corps ascertain what action Congress finally takes in connection with the Appropriations Act." The June 10, 1975, letter also stated that, notwithstanding the expected delay in passage of the FY 1976 Appropriations Act, the "Portland District stands ready to finalize a relocation contract immediately which will become binding on the parties if and when the necessary clarifying language becomes a part of the FY 76 Appropriations Act."

(7) House Report No. 94–319, on H.R. 8122, dated June 20, 1975, incorporated the requisite clarifying language.

(8) On August 19, 1975, the Relocation Contract was executed.

(9) On December 4, 1975, the clarifying language was incorporated in Senate Report No. 94–505.

(10) On December 26, 1975, the FY 1976 Public Works Appropriations Act was passed by Congress. Pub.L. No. 94–180, 89 Stat. 1035 (1975).

(11) On September 24, 1976, civil action No. C75–81T was dismissed, on the ground, that the cause had been pending for more than one year without any proceeding of record having been taken.

Defendant also argues that the terms of the May 23, 1975, Memorandum of Agreement and the August 19, 1975, Relocation Contract are unenforceable because they were agreements to enter agreements in the future. According to defendant, they were written memorials to preliminary understandings reached by the parties that only established procedures to be followed in resolving issues that were expected to come up in the future. Defendant's construction of these instruments does not give adequate recognition to the reasons they were executed.

The Corps' acquisition of a site for the second powerhouse was a project that included supplemental authorization for the planning of a new townsite and relocation of the Town. Such a project necessarily involved a continuing course of sequential activities, in which each was dependent upon completion of an earlier action. This sequence in part, was identified and memorialized in the series of written instruments that the parties negotiated and executed, with assiduous attention to formalities by their authorized representatives. The formal validity of the Memorandum of Agreement and the Relocation Contract is not in question. At issue is the meaning of their provisions.

The Memorandum of Agreement clearly looked forward to agreements to be entered by the parties at a later date, the terms and conditions of which were to be reached in future negotiations. Similarly, the Relocation Contract established procedures in which some matters were left for future resolution. Both instruments, however, embodied mutual agreements that resolved outstanding differences and caused the parties to alter positions in reliance upon the commitments that then were made.

The Memorandum of Agreement incorporated an Enclosure 1, which was a memorandum dated May 20, 1975, captioned "Joint Meeting Between the Town of North Bonneville and the U.S. Army Corps of Engineers in OCE on Above Date." The May 20, 1975, memorandum, in turn, incor-

porated a Joint Position Paper dated May 16, 1975, and a letter from the Corps' District Engineer to the Town's Mayor, dated May 12, 1975, that attached a list dated May 12, 1975, of 45 items that outlined "the Corps' position on Government obligations that need to be resolved in order that we can arrive at a relocation agreement." Each of the documents in Enclosure 1 was signed by authorized representatives of the parties. Paragraph 2 of the Memorandum of Agreement, with respect to Enclosure 1, states: "The parties agree to be bound by and to implement the agreements reached in that memorandum. Pertinent agreements set forth in this paper will be considered as resolving the points on which non-agreement is indicated in the 20 May memorandum."

The Relocation Contract is an integrated instrument in which the parties mutually agreed upon enumerated commitments. Article 2 is captioned "Obligations of the City" and Article 3 is captioned "Obligations of the Government." Article 5, "Conveyance of Real Property," section 3.01 states: "It is agreed that this section constitutes the binding contractual commitment required by Section 83, Public Law 93–251." It is clear that the Relocation Contract does far more than establish a procedure for future agreements.

■ When the requisite contractual elements are present, a commitment to participate in specified procedures in the future can be a contract. The fact that the documents look toward additional agreements in the future does not make it any less a contract as to matters which the parties intended to be resolved. The documents evidence a mutuality of obligation and reflect the intent of the parties at the time they were executed.

■ The program in which the instruments arose went forward. The Corps has acquired properties in the original townsite and has acquired some properties for the optimum town in accordance with the approved relocation plan. The planning effort, and the construction and delivery of necessary new municipal facilities, evidence

the parties' intent that the sequential instruments were binding contracts in accordance with their terms.

It is clear that the parties intended the agreements to be binding at the times they were executed. In reliance upon both the Memorandum of Agreement and the Relocation Contract, the Town agreed to withhold action in its then pending lawsuit. The Town fulfilled this commitment and permitted the case to be dismissed. The Corps was relieved of delays in its construction schedule from that source.

There is abundant evidence to satisfy the requirement for consideration in these contracts. Mutual promises were exchanged; and both parties by their subsequent conduct have altered their positions in reliance upon the commitments that were made.

In Article 5, section 1.02, of the Relocation Contract, the Corps agreed to convey lands "outside the initial town area and outside currently designated Project lands" at prices corresponding to the original prices paid by the Government for said lands plus Government acquisition costs. In section 3.01, the Corps agreed "upon the fulfillment of this contract that no interest in real property acquired for the new townsite will remain in the United States after January 1, 1984."

Section 3.03, captioned "Land in the Optimum Town," requires the Town to provide the Government "a written request for the acquisition of all additional lands required by the City for the optimum townsite." Such written request was to be provided within 30 days after acceptance of the final preliminary site plan. Additional lands requested by the Town for the optimum town development that fall outside the currently designated project lands are to be conveyed "at a price corresponding to the original price paid by the Government for said lands plus Government acquisition costs."

On June 17, 1976, the Town formally requested the acquisition of three particularly described parcels for the optimum

town. There is no dispute that the Town's request was timely and was in proper form. On October 13, 1976, the Corps' District Engineer informed the Town's manager that the lands necessary for optimum town development will not be provided. The Corps took the position that the Town "was and is without authority to enter into this part of the Relocation Contract." This communication directly contravenes the express terms, and is a repudiation of those commitments, of the Relocation Contract. Moreover, after the December 11, 1980, decision of the Washington Supreme Court, and the February 17, 1981, dismissal of the appeal to the Ninth Circuit in the *Miller* case, the excuse given by the Corps was without arguable foundation.

When the complaint was filed, plaintiff asserted the October 13, 1976, letter constituted an anticipatory breach. A ruling on the anticipatory breach now is unnecessary. After the January 1, 1984, termination date for the United States to retain an interest in real property acquired for the optimum town development, the refusal of the Corps to convey was a breach of the Relocation Contract. Damages, if any, for such breach will be determined in subsequent proceedings.

In their motion papers, each party has advanced other grounds for their respective positions. Those arguments have been considered. In the light of the foregoing, however, it is unnecessary to rule on those matters at this time.

On the basis of the foregoing, plaintiff's motion for partial summary judgment is allowed; defendant's cross-motion for summary judgment is denied. Defendant's counterclaim remains to be litigated, and defendant's motion papers present substantial arguments with respect to plaintiff's theories of damages. It may be that plaintiff's victory at this stage will be Pyrrhic. An order will be entered separately to establish a schedule for preparation for trial on damages issues and on the issues in defendant's counterclaim.