COMMONWEALTH OF KENTUCKY, NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION CABINET, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1516C.

United States Court of Federal Claims.

Oct. 30, 1992.

Donald S. Dott, Frankfort, Ky., for plaintiff. Susan Rose Green and Jeffrey M. Sanders of counsel.

Jeri Kaylene Somers, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson. Ann Nunn, U.S. Army Corps of Engineers, of counsel.

## ORDER

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted pursuant to RUSCC 12(b)(1), (4). The issues to be resolved are 1) whether a Memorandum of Understanding between the Army Corps of Engineers and the Commonwealth of Kentucky, acting through its agency the Natural Resources and Environmental Protection Cabinet, setting forth the rights and duties of each party pending divestiture of certain locks and dams on the Kentucky River contains the requisite elements for an express contract and (2) whether jurisdiction is foreclosed, in any event, because the Government, in entering the Memorandum of Understanding, was acting in its sovereign, as opposed to a proprietary, capacity.

## FACTS

The following facts are undisputed. The Kentucky River, a tributary to the Ohio River, consists of 14 locks and dams providing stack water for 254.8 miles to near Beattyville in eastern Kentucky. The Commonwealth of Kentucky ("plaintiff") built locks numbered 1 through 5 during the period 1836–1844, at which time the United States Army Corps of Engineers (the "Corps") took them over for operation. The Corps rehabilitated locks 1–5 and constructed locks 6–14 by 1917. As of 1979 17 cities, including Lexington and Frankfort, and industries depended upon the various pools for water supply. Yet, during the same period, the only commercial navigation was the movement of sand and stone. In addition, the number of recreational boats using the locks on the Kentucky River had declined during the period 1970 to 1978 from 12,400 to 6,400, with approximately 94 percent of those crafts locked during the summer months of May through September.

As some of the locks and dam structures were nearly 140 years old, they experienced considerable deterioration. As a result, the Corps concluded that locks and dams 5–14 of the Kentucky River no longer served the purpose for which they were originally constructed. The need to make more efficient use of funds and manpower resources prompted a 1979 proposal permanently to close the Kentucky River from locks and dams 5–14. A 1980 public notice proposing to suspend operation of the facilities due to lack of commercial navigation was followed by a decision in October 1981 to cease operation and maintenance of the locks and dams and to place the structures in caretaker status in anticipation of divestiture. In December 1982 the Corps issued a Disposition Report announcing that the locks and dams should be disposed of to either state or local governments. After plaintiff expressed its interest in the continued operation of the locks and dams, negotiations began in November 1984 between the Corps and the representatives of plaintiff regarding the disposition of locks and dams 5–14. In a series of meetings, a Memorandum of Understanding (the "MOU") was discussed, drafted, and proposed, which defined the general responsibilities of each party pending the divestiture by the Corps of locks and dams 5–14.

On February 22, 1985, plaintiff and the Corps entered into the MOU in order to reopen locks and dams 5–14. The terms provided that the Corps was to perform one-time maintenance and repairs and major maintenance on locks and dams 5–14. Plaintiff was to make a good-faith effort to bring about the enactment of legislation and appropriations needed to accept the fee simple title to the land and the structures and to maintain the facilities during the

transition period. The transition period was defined as the period beginning on the date when the MOU was signed and ending October 15, 1988.[1] According to the MOU, plaintiff was to accept the fee title to the locks and dams at the end of the transition period or upon earlier transfer of the title. The MOU also provided that the two parties negotiate a lease for the operation and maintenance of the locks and dams during the transition period.[2] It is on the basis of the MOU that plaintiff brings suit.

Plaintiff claims that the Corps failed to perform one-time maintenance and repairs, including major maintenance, as required by the MOU to avert actual collapse of the locks and dams. As a result, plaintiff alleges that the Corps defaulted on its obligations under the MOU. Defendant asserts that the Corps did fulfill its obligations pursuant to the MOU, expending $421,-450.00 for maintenance of the locks and dams during November 1984 through May 1985 and continuing to expend funds during the period 1985 to 1987. Moreover, defendant contends that the Corps provided an annual report to plaintiff in which it summarized its maintenance activities and total funds expended on repairs. According to defendant, from 1985 to 1988 plaintiff provided no indication that it believed the Corps had not fulfilled its responsibilities in accordance with the MOU.

In a letter dated August 31, 1988, from R.F. Knarr, Commissioner of the Natural Resources and Environmental Protection Cabinet (the "Cabinet"), to Colonel Robert L. Oliver, the Corps' District Engineer, plaintiff first gave notice to the Corps concerning its dissatisfaction with the extent of repairs and maintenance performed by the Corps on locks and dams 5–14. The commissioner included a summary of a preliminary review of the locks and dams describing the deterioration and the specific items in need of repair. He stated that the Corps was required to correct all the problems listed in the summary pursuant to the MOU. An update to the preliminary review by plaintiff followed on September 23, 1988. By letter to Col. Oliver, Carl H. Bradley of the Cabinet reiterated plaintiff's understanding that the Corps would correct major maintenance problems. Mr. Bradley offered to discuss the matter at any time, as well as to conduct joint inspections of the locks and dams. Col. Oliver responded by letter on October 21, 1988, with the Corps' survey of the locks and dams. Col. Oliver stated that plaintiff had envisioned a more expanded role for the Corps than had been intended by recent congressional action. Col. Oliver confined his review of the findings presented by plaintiff to the locks and dams for which the Corps had responsibility for major maintenance under the one-year extension of the MOU. In closing Col. Oliver suggested a joint visit to locks and dams 5–8 to more fully explore plaintiff's concerns. At least on one occasion, January 25, 1989, the parties did meet to discuss various repair methods and equipment needs.

Plaintiff continued to advise the Corps of specific repairs needed on certain locks and dams. By letter dated January 18, 1989, plaintiff requested that the Corps perform repairs on locks and dams 12–14 upon a reimbursable basis. By letter of February 28, 1989, the Corps declined to perform the repairs since it could not compete with contractors engaged in similar work.

Dissatisfied with the Corps' response, plaintiff referred the matter to the Cabinet's Department of Law. Donald S. Dott, Counsel for the Cabinet, by letter dated July 25, 1989, to Col. John F. Langowski, the Corps' District Engineer, gave a brief overview describing the inadequacies of the repairs performed by the Corps on locks and dams 5–8 and the total lack of major maintenance on locks 5–8 and dam 5. Mr. Dott concluded that if the Corps did not perform all of the work voluntarily, the Cabinet would pursue its legal remedies. The Corps responded by letter dated August 21, 1989, accounting for all expenditures from 1985 to 1987 on locks and dams 5–14. The Corps asserted that it had undertaken the appropriate repair work each

---

1. The MOU was later extended to October 15, 1989.

2. The lease agreement was executed on May 21, 1985.

operating year that would have been necessary had the Corps itself been operating such structures. The Corps requested a meeting in order to specifically determine what major maintenance work that the Cabinet believed the Corps was obligated to undertake.

Plaintiff, in turn, filed a complaint against the Corps based on breach of contract and other claims under the National Environmental Policy Act, 42 U.S.C. § 4322 (1988), and the National Historic Preservation Act, 16 U.S.C. § 4701 (1988). *Commonwealth of Kentucky, et al. v. United States Army Corps of Engineers*, Civ. Act. No. 89–77 (E.D.Ky. filed Aug. 25, 1989). On June 18, 1990, Judge William O. Bertelsman issued an order dismissing the MOU claim for lack of subject matter jurisdiction. Plaintiff then filed suit in the Claims Court based on its exclusive jurisdiction of the breach of contract action.

## DISCUSSION

■ 1. For an agreement to be considered an express contract under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), the source of the Claims Court's jurisdiction to hear the type of contract claim brought by plaintiff, it must contain the following elements required by common law: mutuality of intent, lack of ambiguity in offer and acceptance, and consideration. *Fincke v. United States*, 230 Ct.Cl. 233, 243–44, 675 F.2d 289, 295 (1982). Facts and circumstances must be present to indicate that the parties have taken upon themselves corresponding obligations and liabilities and have come to a meeting of minds. *Porter v. United States*, 204 Ct.Cl. 355, 365, 496 F.2d 583 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975).

■ In support of its assertion that the MOU is a binding, enforceable express contract, plaintiff states that the MOU adequately sets forth the rights and duties of the parties regarding the maintenance and repairs of the locks and dams. Specifically, the Corps agreed to perform one-time maintenance and repairs, as well as major maintenance, and plaintiff agreed to operate the locks and dams and perform minor maintenance. Defendant counters that the MOU cannot be considered to be an express contract because it lacks sufficient detail in its terms. Defendant explains that for purposes of Tucker Act jurisdiction, the MOU is not sufficiently complete or certain in its terms so that the promises and performances to be rendered can be reasonably determined. As the MOU fails to contain provisions that detail consequences for breach and fails to provide methods for resolving disputes, defendant asserts that the MOU is not an express contract.

Plaintiff cites *Juda v. United States*, 6 Cl.Ct. 441 (1984), to support its assertion that the MOU is an express contract on which an action based on breach may be brought. In *Juda* plaintiffs were inhabitants of the Marshall Islands who sued the Federal Government for breach of an implied-in-fact contract imposing fiduciary duties when it failed to protect their health, well being, and economic condition. The Government had removed plaintiffs from their islands to conduct nuclear weapons testing and resettled plaintiffs on their islands while radiation was still at harmful levels. Plaintiffs alleged a breach of fiduciary obligations created by an implied-in-fact contract. The court stated that although a contract implied in fact is based on conduct, it requires a showing of the same contractual elements as required in an express contract. Defendant argued that plaintiffs did not plead the requisite elements of an implied-in-fact contract and that the consideration alleged (abandoning their homeland to avoid damage from nuclear testing) could not support an implied contract under the Tucker Act. In denying defendant's motion to dismiss, the court found that the facts alleged established conduct sufficient to show a tacit understanding and a meeting of minds. The Government promised to take care of plaintiffs until it no longer needed their islands for tests, and plaintiffs, in exchange, agreed to abandon their homeland and accept temporary exile at other locations. The court concluded that such conduct, if

shown, could support an implied-in-fact contract.

If an implied-in-fact contract were shown, the *Juda* court reasoned, the court would have jurisdiction under the Tucker Act to hear the case. Contrary to defendant's assertion that plaintiff's claim would be cognizable only if the fiduciary obligations were founded on a statute, treaty, regulation or fifth amendment taking, the *Juda* court held: "When a contract, express or implied, has been made by federal officials who Congress has authorized to so act on behalf of the United States, ... the court is not required to make further inquiry to determine whether a separate source of substantive law mandates compensation...." *Id.* at 453. Similarly, if the MOU amounts to an express contract, an action for breach of that contract would lie. On that point *Juda* does not add significantly to the discussion of whether an express contract has in fact been established.

Plaintiff likens its situation to that of the plaintiff in *North Bonneville v. United States*, 5 Cl.Ct. 312 (1984). The court ruled that when requisite contractual elements are present a commitment to participate in specified procedures in the future can be a contract. In *North Bonneville* the Corps' construction of a dam on the Bonneville River required the relocation of a town. In a course of dealings, the town and the Corps undertook extensive planning and relocation activities, including the negotiation and subsequent execution of a series of written instruments to facilitate the relocation. The town later sued the Corps for breach of two agreements, a Memorandum of Agreement (the "MOA") and a Relocation Contract.[3] The court found the agreements were valid and binding. Both instruments, the court stated, embodied mutual agreements that resolved outstanding differences and caused the parties to alter their positions in reliance upon the commitments that then were made. Moreover, the MOA incorporated an enclosure, a memorandum, stating that the parties agreed to be bound by and to implement the agreements reached in that memorandum. Similarly, the Relocation Contract was an integrated instrument in which the parties mutually agreed upon enumerated commitments. Article 5, § 3.01 stated: "It is agreed that this section constitutes the binding contractual commitment required by Section 83, Public Law 93–251." 5 Cl. Ct. at 323.

The court in *North Bonneville* next found consideration present in both the MOA and Relocation Contract. Not only were mutual promises exchanged, but both parties by their conduct had altered their positions in reliance upon the commitments that were made. The Corps had acquired properties in the original townsite and acquired properties for the optimum town in accordance with the relocation plan. The planning, construction, and delivery of the new municipal facilities evidenced the parties' intent that the instruments were binding in accordance with their terms.

The MOU in this case is quite different from the MOA in *North Bonneville*. Because the MOA in *North Bonneville* was one in a series of instruments entered into by the Corps and the town, the parties incorporated by reference relevant provisions of the preceding instruments. The instruments also included standard provisions for governments contracts and incorporated numerous attachments by reference. As a result, the MOA, which merely set forth the understandings between the Corps and the town, did not stand alone. A Contract for Services, a Contract for Professional Services, and the Relocation Contract—all incorporated by reference—gave the MOA the character and effect of a binding express contract.

The MOU does not carry the same weight. It does define the rights and duties of both the Corps and plaintiff. During the period of disposition of the locks and dams, the Corps agreed to per-

---

**3.** The stated purpose of the MOA between the town and the Corps was "to set forth current understandings, agreements, and planned actions and procedures and relationships between" the town and the Corps in regard to the relocation of the town. 5 Cl.Ct. at 315. The Relocation Contract estimated the cost of the town's move and recited that the town and the Corps had agreed on the general concept for the development of design of the new townsite.

form repairs and major maintenance. For its part plaintiff agreed to use best efforts to acquire the locks and dams. However, as there are no provisions stating that the MOU is binding, as in *North Bonneville*, or any other evidence of the parties' intent to make the MOU binding, the MOU cannot be so interpreted.

Plaintiff also looks to the facts in *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957 (Fed.Cir.1989), as instructive in the case at hand. In *San Carlos* plaintiffs entered into a repayment contract with the Secretary of the Interior, involving the Coolidge Dam, to construct a power plant, irrigation plant, and an electricity transmission and distribution system. The Government agreed to maintain and operate the existing dam, reservoir, and other associated projects, and plaintiffs agreed to pay 5 percent of the construction costs and all operating and maintenance costs. Plaintiffs filed suit for breach of its contracts and agreements with the Government when high water damage resulted in a shutdown of the dam and power plant, leaving no way to generate electrical power or store water. The Claims Court dismissed the action based on its conclusion that the duties alleged by plaintiff were not created by the repayment contract, and, therefore, plaintiffs had failed to state a claim for which relief could be granted. *San Carlos Irrigation & Drainage District v. United States*, 15 Cl.Ct. 197, 203–04 (1988), *rev'd*, 877 F.2d 957, 959 (Fed.Cir. 1989), *later proceeding*, 23 Cl.Ct. 276 (1991). The Federal Circuit reversed, finding that the repayment contract established that the Government had contracted to keep the entire dam works in a state of repair and to guard against their failure. 877 F.2d at 960. The court construed that the general duty to operate and maintain the entire works included specific duties to operate and maintain the spillways and the electric generation system.

In *San Carlos* the Federal Circuit set forth the criteria that must be established in order to recover for breach of contract: (1) a valid contract between the parties, (2) an obligation or duty arising out of a contract, (3) a breach of that duty, and (4)

damages caused by breach. 877 F.2d at 959 (citing *Giroir v. MBank Dallas, N.A.* 676 F.Supp. 915, 918–19 (E.D.Ark.1987)). In applying these criteria, the court stated that the Claims Court found that the Government "expressly agreed ... to operate and maintain the project." 877 F.2d at 959 (citing 15 Cl.Ct. at 203). At issue was the second criterion—whether the specific duties to maintain and operate the spillway gates and to maintain the electric generation system were created by the repayment contract. Whether the repayment contract was binding and enforceable was not at issue. The court in *San Carlos* concluded that if the plaintiffs could prove that the Government had breached its contractual duties to maintain the dam and power plant, then general damages could be recovered.

In contrast, the case at hand turns on the first criterion—whether a valid contract between the parties is present. Plaintiff omits the first part of the analysis, concluding that the Corps had contracted to keep the locks and dams in repair and then breached the contract. In *San Carlos* the duty to maintain and operate the dam was part of a larger repayment contract. Simply because the Corps engaged in an agreement to repair and perform major maintenance on certain locks and dams, similar to the agreement in *San Carlos*, does not thus render it a binding contract from which specific contractual duties arise.

The MOU establishes general relations and procedures between the Corps and plaintiff pending divestiture of the locks and dams by the Corps. The United States is the fee simple owner of the locks and dams 1–14 located on the Kentucky River. All federal navigation projects are subject to periodic review to determine whether continued operation is warranted. In April 1980 the Corps proposed to suspend operation of the facilities due to the cessation of commercial traffic through locks and dams 5–14. The Corps did suspend operation of the locks and dams, placing them in caretaker status. Plaintiff then expressed its interest in the continued operation of the locks and dams. After extensive negotia-

tions, the Corps and plaintiff entered into the MOU.

No evidence suggests that the MOU would be binding, nor did the parties provide a remedy in case of breach. The MOU is not one in a series of instruments agreed upon, nor is it part of a more general contract. The MOU merely sets out the procedure to govern the transfer of a fee simple. Without more detail as to forms of dispute resolution or remedy for breach, it fails to contain the requisite elements of an express contract.

Although defendant's motion is sustainable on this ground, its objection more properly should be considered as the failure to state a claim upon which relief can be granted, rather than lack of jurisdiction. The Tucker Act confers jurisdiction over actions based on express contracts; the point in contention is whether plaintiff can bring the instrument on which it relies within the requirements for an express contract as established by the case law.

 2. Even if elements of a contract could be identified in the MOU, contract liability that is enforceable under the Tucker Act "does not extend to every agreement, understanding, or compact which can be semantically stated in terms of offer or acceptance or meeting of minds." *Kania v. United States*, 227 Ct.Cl. 458, 464, 650 F.2d 264, 268, *cert. denied*, 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). Specifically, the Government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity. *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925). Whether particular acts of the United States are performed in a sovereign capacity or in a proprietary capacity turns on the nature of the Government's action and the nature of the parties involved. *Juda*, 6 Cl.Ct. at 454. When the United States enters into contracts with local public agencies to provide loans or grant funds in furtherance of general public objectives, the loan or grant is undertaken in its sovereign capacity. Even though the Government is in privity of contract with a claim-

ant, no liability arises for government acts taken for benefit of the general public.

 The sovereign act defense, however, has no application when the challenged government actions do not have public or general applicability, or when the actions were focused principally and primarily on the direct relationship with the claimant. *Juda*, 6 Cl.Ct. at 454 (citing *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786 (1978); *Ottinger v. United States*, 116 Ct. Cl. 282, 88 F.Supp. 881 (1950)). As the *Kania* court stated:

> The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations all engage in among themselves.

227 Ct.Cl. at 464, 650 F.2d at 268.

 In this case the Corps, by divesting itself of the locks and dams was implementing a sovereign function and not acting in a proprietary capacity. Plaintiff made the point during oral argument that, as the court concluded in *North Bonneville*, the MOU does not fit into either class. In *North Bonneville* the contracts between the Corps and the town were not identical with the class of contracts whereby the sovereign engages in the purchase or sale of goods, lands or services, or other transactions that compare with contracts between private parties. Plaintiff in that case argued, however, that the MOA and Relocation Contract were concerned with the purchase and sale of lands, goods, and services in a manner that is customary in contracts municipalities make with public utilities. The court in *North Bonneville* deemed plaintiff's argument persuasive.

The same argument is not compelling in this case. The Government is not entering the market place in a proprietary capacity to engage in the sale of lands, goods, or services. The United States owns the locks and dams. Using the MOU as a guideline, the Corps has the discretion to determine the extent to which it will maintain the

locks and dams, the specific repairs it will perform, and the amount of funds it will expend providing maintenance to the property. The Corps does not derive a benefit in spending its resources on repairs and maintenance of the locks and dams that it had previously closed. All actions taken to repair and maintain locks and dams 5–14 are in the public interest for the public benefit. Because the Corps is providing repairs and maintenance for the benefit of the general public, the MOU is not of the character of a contract that could be made with a private owner. Because no express or implied contract can arise from acts performed by the Government in its sovereign capacity, *see, e.g., D.R. Smalley & Sons v. United States,* 178 Ct.Cl. 593, 597–98, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967), the MOU cannot establish the basis for Claims Court jurisdiction.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court shall dismiss the complaint for lack of subject matter jurisdiction.