**SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT**

**v.**

**The UNITED STATES.**

**No. 460–86L.**

United States Claims Court.

July 28, 1988.

198

Riney B. Salmon, II, Phoenix, Ariz., for plaintiff. Glenn J. Carter and Michael A. Beale, of counsel.

Louise F. Milkman, Washington, D.C., with whom was Asst. Atty. Gen. Roger J. Marzulla, for defendant. Robert Moeller and William H. Swan, U.S. Dept. of the Interior, of counsel. Bernard M. Sisson, U.S. Dept. of Justice, of counsel.

OPINION

MARGOLIS, Judge.

This contract case comes before the court on the defendant's motion for summary judgment. Oral argument on the motion was heard on April 12, 1988. After reviewing the record and at the conclusion of that hearing, the court granted the defendant's motion for summary judgment. The court indicated at that time that a written opinion would be issued.

FACTS

On June 7, 1924, Congress passed the San Carlos Act, which created the San Carlos Irrigation Project. Ch. 288, 43 Stat. 475 (1924). The Act authorized the construction of the Coolidge Dam across the Gila River near San Carlos, Arizona for the purpose of collecting irrigable water that could then be delivered to project lands, which consisted of 50,000 acres on the Gila River Indian Reservation and 50,000 acres of public and private lands. The total cost of the project was to be "distributed equally per acre among the lands in Indian ownership and the lands in public or private ownership that can be served from the waters impounded by said dam." *Id.* at 475. The United States was to retain ownership of all project works.

The San Carlos Act directed the United States to enter into "an appropriate repayment contract" with an irrigation district representing the irrigable non-Indian lands in the project. 43 Stat. at 476. On July 16, 1928, the San Carlos Irrigation and Drainage District (District) was formed pursuant to state law to represent the private landowners. Also in 1928, Congress authorized the development of hydroelectric power generation facilities at the Coolidge Dam. Ch. 137, 45 Stat. 200, 210 (1928). This legislation provided that the Secretary of the Interior was "authorized to sell surplus power developed at the Coolidge Dam in such manner and upon such terms and for such prices as he shall think best." *Id.* at 211.

On June 8, 1931, the District and the United States entered into a Repayment Contract setting forth the rights and obligations of the parties. The District was to pay annually to the United States, in addition to all operating and maintenance costs, five percent of the construction cost of the project plus interest such payments to begin no earlier than December 1, 1935.

On November 12, 1935, the Repayment Contract was supplemented to reduce the reimbursement payments that were scheduled to begin that year. The first supplement to the Repayment Contract provided that the District would pay for the con-

struction costs, without interest, in forty equal installments beginning on December 1, 1935. On May 29, 1947, the Repayment Contract was once again supplemented to reduce the District's reimbursement payments. The second supplement to the Repayment Contract set the amount to be repaid each year on a sliding scale according to the amount of water in the reservoir. According to this scale, the District would pay to the United States for construction costs as little as $12,500 per year in the event that there was less than 100,000 acre-feet of stored water in the reservoir, on up to a maximum of $125,000 per year if there was more than 400,000 acre-feet of stored water.

On June 15, 1938, the Secretary of the Interior executed a Joint Works Order [1], an administrative operating order that did not amend the Repayment Contract or Landowners' Agreement. In this Joint Works Order, the District was given the responsibility, which it had requested, of operating and maintaining the works that served the District lands exclusively. The United States indicated that it would continue to operate and maintain the Joint and Indian Works "in the best possible manner so as to promote efficiency and economy in the use of water and conserve the Project water supply."

Shortly after the dam was completed, problems surfaced concerning the condition of the dam's six 50–foot by 12–foot spillway gates. [2] Originally designed as steel sector gates of conventional design, reinforced concrete was substituted for structural steel in the body of the gates. Evidently, due to the use of high alkali cement used in the gates and supporting structures, an ensuing alkali-aggregate reaction caused the cement to swell and crack over a period of time. Eventually, this swelling caused the gates to bind and stick within the gate chambers.

In 1936, five years after the gates were constructed, the project engineer reported that it was necessary to remove 1/4" from the gate strips in an attempt to alleviate the binding caused by the swelling. By 1939, the gates were once again binding, necessitating further study and repair. In 1960, an extensive study was done on behalf of the United States to assess the condition of the spillway gates. In the April 11, 1960 report, General Engineer J.W. Chamberlin revealed that continued swelling in the gates structures had necessitated the removal of up to 4 inches from the pier face in some spots in unsuccessful attempts to relieve binding. The report further found that the steel in the gates had been "stressed and elongated to the point of bond failure" and that "it is extremely doubtful that the slab is now structurally sound." The report concluded that due to the expansion of the concrete in the gates "the six spillway gates at Coolidge Dam should be abandoned as inoperable and not susceptible of economic repair." The report disclosed that:

> The net result of [rendering the gates inoperable] will be the loss of 200,000 acre-feet of storage that has never been utilized since Coolidge Dam was constructed. If the need should arise it will be technically feasible to install new sector gates or ... construct some type of vertical lift gate on top of the present gates.

Since 1960, Marvin Young, the Project Engineer of the San Carlos Irrigation Project, had been exploring possible replacements for the functionally inoperable spillway gates. On January 5, 1962, Young, in a letter to the Area Director, stated that:

> I concur in the opinion that operable spillway gates should be provided at Coolidge Dam as soon as possible; however, it is recognized that it would be difficult to obtain funds for this purpose in the near future.

Until funds were available for new permanent gates, Young suggested the installation of temporary wooden gates as a standby measure. Young believed that such ac-

---

1. The Joint Works include the Coolidge Dam, the San Carlos Reservoir, and the electrical generation and distribution system.

2. A spillway is a channel for reservoir overflow.

tion "would demonstrate our determination to conserve San Carlos Reservoir water at spillway elevation in the event this opportunity presents itself." However, because the level of water in the reservoir was not approaching the spillway elevation, no action was taken at that time.

In 1966, as the level of water in the reservoir approached the level of the spillways, yet another analysis of the condition of the gates, this time prepared by R. H. Rupkey, Area General Manager, Bureau of Indian Affairs, Department of the Interior, concluded that:

> Due to the expansion of the concrete in the gates, and the resultant binding against the pier walls, and due to the inoperative condition of the hinges and operating mechanisms for these gates, it has been considered for many years that the gates are no longer serviceable.

> In order to avoid possible partial closure of the gates during spillage, and possible inability to open the gates to full extent after partially closing, it has been deemed necessary to cause the gates to be left permanently in the open, or down, position.

Rupkey then gave detailed instructions on how to permanently disable the gates. Shortly thereafter, the gates were immobilized in accordance with these instructions.

In February of 1966, the Area Director wrote the Commissioner of Indian Affairs and informed him that updated forecasts indicated that "the likelihood of spillage over the ungated Coolidge Dam this year is lessening." At the same time, the Area Director mentioned that the project had "included an amount of $400,000 in budget requests during recent years for installation of metal radial gates." The Director concluded that permanent spillway gates should be installed as soon as appropriations become available as the gates could be necessary for use the following year.

However, the project was never able to obtain funding to install the gates.

In the Spring of 1973, the reservoir once again approached the spillway elevation. On April 3, 1973, the Board of Directors of the San Carlos District approved the installation of concrete flashboard spillway gates. Later in 1973, the United States installed the non-movable flashboard gates at a cost of approximately $30,000.

On February 7, 1979, a Bureau of Reclamation Travel Report determined that the flashboard gates were extremely unsafe because it would be virtually impossible to remove the flashboards once water was loaded against them. The report recommended that the flashboards be removed as soon as possible. The report recognized that removal of the flashboards would eventually result in the operation of the spillways and, accordingly, listed a number of the consequences of such operation, including damage to the spillways and tailrace [3] that could damage the electrical generation facilities. Before the flashboards were removed in 1980, the reservoir filled until water spilled over the top of the flashboards by 0.5 foot. When the water receded in late 1980, the flashboards were then removed.

Spurred by the 1976 failure of the Teton Dam, the Department of the Interior launched an intense review of dam safety and created a Safety Evaluation of Existing Dams (SEED) team. In February 1980, the BIA requested the Bureau of Reclamation (BOR) to perform a safety inspection of Coolidge Dam. This request was made as a result of the Buttes Dam investigation findings that indicated, using new flood hydrology studies, that the Coolidge Dam's spillways were underdesigned to accommodate the estimated Gila River floods. The SEED report for the Coolidge Dam was completed on September 23, 1980, before the flashboards were removed.

The SEED report revealed that the penstocks [4] were in a deteriorated condition

---

3. Tailrace is the phenomenon in which the release of large quantities of water into a restricted area causes the water to move upstream, or in this case, towards the dam.

4. A penstock is a large diameter pipe that carries water from the reservoir through the dam to the power plant where the water, which is under high pressure, is used to generate electricity.

and that, while not a major safety problem at the time of inspection, extensive damage to the power plant could result if conditions worsened. The SEED report also indicated that if the spillways were operated, tailrace would probably inundate the powerhouse.

In 1981, the BIA requested the BOR to identify the magnitude of dam safety-related problems at Coolidge Dam and to propose possible corrective actions. The BOR completed this review and forwarded its findings to the BIA in 1982. In response to this review, the BIA in early 1983 requested that the BOR undertake immediate rehabilitation of the penstocks.

On October 1, 1983, while the BOR was preparing to rehabilitate the penstocks, a storm caused large inflows into the San Carlos Reservoir. On October 4, 1983, the reservoir began to spill over the spillway crest. On October 6, 1983, the cylinder gates that allow water to enter the penstocks were closed. Also on October 6, the switchyard began to settle, causing the soil to cave in and resulting in damage to electrical equipment in the switchyard. A dam inspection team was immediately dispatched to monitor the situation. The inspection team witnessed high tailwater near the dam and the November 23, 1983 report of the inspection team indicated:

> It was thought that the settlement [of the switchyard] was caused by high tailwater seeping into the fill resulting in areas of consolidation, but due to the condition of the penstocks, we were also concerned that penstock leakage could have contributed to the settlement.

In 1985, rehabilitation of the penstocks was begun and completed in October 1986. A new switchyard was constructed in a remote area away from the dam. Bids for rehabilitation of the power plant were expected to be issued in May 1988. Costs for this construction were to be funded from power generation revenue reserves.

On July 28, 1986, the San Carlos Irrigation and Drainage District filed a complaint in this court claiming that the San Carlos Act, the Landowners' Agreement, the Repayment Contract, and the Joint Works Order obligate the government to operate and maintain the facilities in such a manner so as to prevent water loss and to provide electrical service. Accordingly, plaintiff seeks one half of the following amounts: $28,910,000 for 413,000 acre-feet of lost irrigation water; and $10,241,148 for 123,-090,720 of lost kilowatt hours of electricity. The defendant filed a motion for summary judgment arguing, among other things, that plaintiff failed to state a claim upon which relief can be granted and that, regardless, the action was barred by the statute of limitations.

## DISCUSSION

While it is necessary that the government manifest its intent to waive sovereign immunity through "affirmative statutory or contractual terms," *United States v. N.Y. Rayon Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577 (1947), if a claim falls within the Tucker Act, 28 U.S.C. § 1491, the United States has presumptively consented to suit, *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983). However, the Tucker Act does not provide a substantive right upon which a party may bring suit against the United States; rather, the right claimed must be found in some other source of law. *Id.; United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

The Claims Court's jurisdiction over contract claims against the government is well established, and government liability in contract is an unequivocal waiver of federal immunity from suit. *Mitchell*, 463 U.S. at 215, 103 S.Ct. at 2967. Further, where a claim is based upon a contract entered into by federal officials authorized by statute to so act, the court need not make a further inquiry to determine whether a separate source of substantive law mandates compensation. *Juda v. United States*, 6 Cl.Ct. 441, 453 (1984). Instead, a claim founded upon a valid contract is cognizable under the provisions of 28 U.S.C. § 1491(a)(1) because "[t]he law of contracts mandates the compensation the United

States is obligated to pay for a breach." *Juda*, 6 Cl.Ct. at 453.

Nonetheless, in *Nutt v. United States*, 12 Cl.Ct. 345, 350–51 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed.Cir.1988), the Claims Court stated:

Review of contract claims justifiably is ... limited and subject to very stringent requirements. Since the Government can incur money damages in a contract action, the Government will be held to have obligated itself in contract only upon a showing of an express or implied-in-fact agreement to do so. This formidable standard serves to protect the fisc from all suits under contract claims except where the evidence guarantees with some certainty that the Government has agreed to waive its sovereign immunity. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). It also assures a necessary measure of flexibility to the Government in its daily operations so that it need not answer in damages for each false step or innocent legal error in administering the myriad of programs and functions that occupy its efforts.

The plaintiff in this case asserts two claims based upon the same breach of contract theory: 1) that the defendant failed to properly operate and maintain the spillway gates at the Coolidge Dam thereby breaching a contractual duty to maintain the dam's designed storage capacity; and 2) the defendant failed to properly operate and maintain the electrical generation system at the Coolidge Dam thereby breaching a contractual duty to generate and sell power.

The court's first inquiry in this case must be to determine whether such contractual duties exist. For unless the defendant has undertaken such duties, the defendant cannot be said to have breached the contract on that basis. The San Carlos Act and the Repayment Contract dated June 8, 1931, delineate each party's rights and responsibilities concerning the Coolidge Dam and related structures. Plaintiff relies upon section 9 of the Repayment Contract, which provides that "[t]he Government, through its duly appointed agencies, will continue to maintain all of the project works...."

The defendant responds that this provision does not constitute a bargained-for promise by the government to operate and maintain the project in accordance with the anticipations and expectations of the District, with the attendant risk of money damages. The defendant argues that the provision merely states an operating arrangement—a delineation of responsibilities as opposed to a commitment to ensure that the dam is maintained in accordance with standards left unarticulated in the contract.

■ The court concludes that the defendant correctly interprets the Repayment Contract insofar as the damages the plaintiff seeks are not within the contemplation of the parties. The purpose of the Repayment Contract was to ensure that the United States would eventually recover the project's construction costs. As far as other duties are concerned, the Repayment Contract provides only that the United States will "continue to maintain" the project. There are no standards of maintenance or any other provisions that can be read to mandate compensation for the manner in which the project is maintained. In fact, the Repayment Contract provides that proceeds from the sale of water will go towards reimbursing the United States for the cost of maintaining the dam, "however it may be operated or maintained."

Plaintiff urges the court that the word "maintain" requires the defendant to keep the San Carlos Project in its original serviceable state and cites to the dictionary definition of the word for support. However, in interpreting the contractual language, it is important to look to the context of the express contractual language. In the absence of an express agreement, the burden of maintenance imposed by the contract on the defendant cannot include any and all replacements, rebuilding, and restoration of all structures, and at the same time, the defendant should incur liability for damages caused by any shortcomings in such maintenance. *See El Paso Water Improvement District v. City of El Paso*,

243 F.2d 927, 930 (5th Cir.), *cert. denied,* 355 U.S. 820, 78 S.Ct. 26, 2 L.Ed.2d 36 (1957). To rule otherwise would be to rule "that the United States ... assumed a potential liability of incalculable and undeterminable extent and amount." *Id.* at 931.

In this case, the defendant expressly agreed to construct a dam in return for reimbursement from the District for the dam's cost, to apportion and distribute equally to all subject lands such water that was diverted from the Gila River, to operate and maintain the project, and to divide the costs for such operation and maintenance equitably. If the defendant fails to fulfill these contractual duties, the District can appropriately seek redress for breach of contract.

■ Nevertheless, the absence of spillway gates and the temporary failure to generate power do not amount to a breach of the Repayment Contract. Nowhere in the Repayment Contract does the defendant covenant to undertake these duties. Instead, the San Carlos Act and the Repayment Contract vest in the Secretary of the Interior a great deal of discretion concerning the operation and maintenance of the dam. After extensive and detailed studies, the government concluded that the spillway gates imperiled the safety of the dam. Temporary replacements were installed, but these also were found to be unsafe. New gates are presently being designed and constructed to replace these earlier gates. In fact, for many years the defendant sought funding to install replacement gates; however, Congress declined to appropriate funds.

While it is unfortunate that the spillways were forced to operate in 1983 causing damage to the power plant and loss of water that may otherwise have been used for irrigation, these are not losses and damage for which the government assumed liability. Although the United States agreed to maintain and operate the project works, nowhere in the contract does the government agree to be liable to the plaintiff for lost water reserves or power generation. Similarly, there is nothing in the statute that can be fairly read to mandate

compensation for such losses. Concerning water distribution rights, the Repayment Contract provides:

> The stored and pumped water of the San Carlos Project shall be deemed a common Project water supply in which all lands in the project and under the San Carlos Reservoir shall be entitled to share equally, and all such waters shall be distributed to the lands of the project as equitable as the physical conditions permit. Apportionments of such water shall be made by the Secretary of the Interior at the beginning of each annual irrigation season and any increase of the water supply during a particular season may be apportioned likewise.

Under the contract, "[t]he government was and remained simply a carrier and distributor of the water ..., with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works." *Ickes v. Fox,* 300 U.S. 82, 95, 57 S.Ct. 412, 417, 81 L.Ed. 525 (1937). No further duties or liabilities can be divined from the language of the Repayment Contract or the San Carlos Act itself.

■ Concerning power generation, the Act of 1928 provides that "the Secretary of the Interior is authorized to sell surplus power developed at the Coolidge Dam in such manner and upon such terms and for such prices as he shall think best." Again, the Secretary is accorded complete discretion concerning the manner and the terms in which power will be generated at the dam. As such, the defendant does not have a duty to generate surplus power, and a failure to generate surplus power does not create a claim under the Tucker Act for which plaintiff can obtain relief.

In the absence of contractual provisions expressly containing such duties, the court cannot impose such duties upon the United States. In *Pine Hill Coal Co. v. United States,* 259 U.S. 191, 196, 42 S.Ct. 482, 483, 66 L.Ed. 894 (1922), the Supreme Court ruled that "[a] liability ... is not to be imposed upon a government without clear words." The Court continued: "[W]here

... the liability would mount to great sums, only the plainest language could warrant a court in taking it to be imposed." *Id.*

Moreover, because there are no contractual provisions concerning the manner in which the project must be maintained, to the extent that the plaintiff urges that the defendant negligently maintained the spillways and the power plant, that claim sounds in tort. Because the Tucker Act specifically precludes the Claims Court from exercising jurisdiction over claims sounding in tort, *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 751–52, 508 F.2d 817, 822 (1974); *Eastport Steamship Corp.*, 178 Ct.Cl. at 609, 372 F.2d at 1010, the Claims Court is not the proper forum to entertain such a claim.

Plaintiff's protestations that summary judgment is not appropriate because genuine issues of material fact exist with regard to the cause of the damages to the project works are of no moment. Even taking plaintiff's factual allegations as true, the plaintiff has failed to show that the United States has breached any contractual duties with the District. Therefore, the defendant's motion for summary judgment must be granted.

Since the court has disposed of this case on other grounds, the court need not consider whether the plaintiff's claims are barred by the statute of limitations.

## CONCLUSION

For the reasons stated above, plaintiff's complaint fails to state a cause of action for which relief can be granted. Accordingly, the defendant's motion for summary judgment is granted. The Clerk will dismiss the complaint. Each party will bear its own costs.