**SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 460–86L.

United States Claims Court.

May 27, 1992.

Riney B. Salmon, II, Phoenix, Ariz., for plaintiff. Mikel L. Moore, of counsel.

Glen R. Goodsell, Washington, D.C., for defendant. Robert Moeller, U.S. Dept. of the Interior, Phoenix, Ariz., of counsel.

## OPINION

MARGOLIS, Judge.

This case is before the court on the defendant's motion for summary judgment on damages. Because the facts in this case have been exhaustively recounted in three court opinions, this court need not do so now. *See San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 958–59 (Fed.Cir.1989); *San Carlos Irrigation & Drainage District v. United States*, 23 Cl.Ct. 276, 277–78 (1991); *San Carlos Irrigation & Drainage District v. United States*, 15 Cl.Ct. 197, 198–201 (1988). After a careful review of the record, and after hearing oral argument, this court denies defendant's motion for summary judgment on liability with regard to the allocation of power, but grants the motion in all other respects.

## DISCUSSION

This contract case has reached the final stage of analysis. Having determined that a valid contract existed between the parties, that a duty arose out of that contract, and that defendant breached the duty, this court must now determine whether the breach of the contract duty damaged the San Carlos Irrigation and Drainage District ("District"). Without a showing of damages, the District cannot prevail in this action. *San Carlos*, 877 F.2d at 959.

Defendant moves for summary judgment, contending the District seeks damages for items that the Repayment Contract, Joint Works Order and pertinent statutes never contemplated defendant would be obligated to provide the District, namely, excess water and power. Defendant asserts that despite its breach it continues to meet its obligation to provide the district with allocations of water and power. The District counters that factual issues are in dispute which must be resolved through a trial.

The District asserts that as a result of the breach of the contract duty, its damages included:

(1) the loss of water that the gates were designed to retain in the reservoir; (2) the loss of power due to the absence of any way to generate power; and (3) the cost of repairing the gates and related hydroelectric facilities.[1]

Plaintiff's Response to Defendant's Motion for Summary Judgment on Damages at 10. In its complaint, the District quantified the damages as $14,455,000 for one-half of approximately 413,000 acre-feet of irrigation water lost during the period of October 1, 1983 to June 30, 1985 and as $5,120,575 for one-half of 123,090,720 kilowatt hours of electricity lost during the same period. The District further seeks unquantified damages for power and water lost after June 30, 1985.

Defendant maintains that the District could not have suffered direct damages because it received, and continues to receive, its contractual allocation of power and water pursuant to the terms of the Repayment Contract. Under the Repayment Contract, the Secretary of the Interior is obligated to distribute an annual allotment of water to lands of the San Carlos Irrigation Project ("Project") in exchange for a fixed per acre charge paid by the District that is sufficient to satisfy estimated operation and maintenance expenses of the Coolidge Dam ("Dam"). With regard to power, although the contract does not explicitly state that defendant is required to provide the District with an allocation of power at cost, defendant, citing a 1975 memorandum of the District's engineer, concedes that the District is entitled to obtain pumping power at cost.

---

1. The District has not raised a claim for the cost of repairing the gates and hydroelectric facilities in its complaint and has not elaborated on it in its response to defendant's summary judg-
ment motion. At oral argument, the District acknowledged that such damages had not yet been incurred.

The District asserts "that, but for the United States' failure to properly operate and maintain the Dam, water and power was lost to the District that would have otherwise been available to the District." Plaintiff's Response to Defendant's Motion for Summary Judgment on Damages at 14. This assertion apparently does not refer to defendant's contractual allocation of water because defendant has not failed to meet this obligation, despite the 1983 flood. According to the affidavit of Thomas W. Neumann, the Project's Supervisory Hydraulic Engineer, defendant's annual apportionments of water have provided the District with more water than it has been able to use. The District does not dispute this point. In fact, in the three years after the 1983 flood, more water was stored behind the Dam than the three years before.

■ However, defendant's contractual allocation of power is a different matter. Even though no power has been generated at the Dam since 1983, defendant continues to provide the District with power for irrigation pumping that it acquires from other sources. Defendant maintains it calculates the annual charge for power based on the average cost for generating power at the Dam between 1973–82. The District disputes defendant's method of determining costs and notes that those costs have risen sharply since 1983. The District asserts that if it is to be charged for power it should pay no more than the actual average replacement cost of power. Because this court finds that a material factual issue exists about the actual cost of the power provided the District, it agrees with the District that disputes of genuine issues of material fact exist regarding the allocation of power and therefore denies the defendant's motion for summary judgment in this regard.

■ Defendant further maintains that the loss of power and water following the 1983 flood has not damaged the District because the Repayment Contract "expressly leaves the distribution of surplus power and water [water beyond that distributed to the District and the Pima Indians and power beyond that used for running the irrigation pumps] from the Coolidge Dam to the discretion of the Secretary." Defendant's Motion for Summary Judgment at 17. In accordance with the Act of March 7, 1928 ("1928 Act"), ch. 137, 45 Stat. 200, 211–212, the Repayment Contract specifically authorizes the Secretary of the Interior to "supply water for irrigation and other purposes" to various entities "upon terms to be fixed by the Secretary of the Interior" after the Secretary delivers the annual apportionment. Repayment Contract at 9. Such distributions must be "in accordance with law, and for the interests of the Project...." *Id.* Further, "[p]roject managers under the control of the Secretary of the Interior, when the situation warrants, may deliver excess water free on an equitable basis...." Repayment Contract at 8–9.

The District counters by pointing to language regarding water in the Repayment Contract stating that "sums collected by or for the benefit of the Project ... shall go to pay a proper share of the cost of operating and maintaining the Project, however it may be operated or maintained." Repayment Contract at 9–10. When surplus water is unavailable, the District contends, it is damaged because its operation and maintenance expenses are not reduced by the revenue such water could produce. As defendant notes, the flaw in the District's argument regarding excess water is that it overlooks the discretion placed with the Secretary of the Interior by the 1928 Act, the Repayment Contract and the Joint Works Order. The Repayment Contract allows defendant to distribute excess water for free, and the Joint Works Order grants defendant "the right to change at any time the charge for excess water." Joint Works Order at 10. The District is not entitled under the Repayment Contract to have surplus water sold at a price sufficient to generate revenue that can be used to defray the operation and maintenance expenses; the District only is entitled to have revenue applied in such a fashion *if* the defendant acts in its discretion to create such revenue. No guarantee that revenue will be generated exists in the pertinent statutes or documents.

The arguments as to surplus power are similar to those concerning surplus water. Defendant argues the District could not have been damaged as a result of its breach because any distribution of surplus power is within its discretion. In accordance with the 1928 Act, the Repayment Contract provides that "power shall be furnished ... for agency and school purposes and for pumping for irrigation by Indians on the San Carlos Reservation at a cost not exceeding 2 mills per kilowatt hour." Repayment Contract at 17. The Repayment Contract makes no express mention of pricing or allocating power for other reasons. However, the 1928 Act authorizes the Secretary of the Interior "to sell surplus power developed at the Coolidge Dam in such manner and upon such terms and for such prices as he shall think best...." 1928 Act at 211.

The District notes that the 1928 Act also requires defendant to use available net revenues from the sales of surplus power to defray operation and maintenance costs.[2] *Id.* The Repayment Contract confirms this obligation. Repayment Contract at 15–16. Again, however, the District's argument overlooks the discretion the 1928 Act places with the Secretary of the Interior, who, if a surplus of power exists,[3] may set any terms and price for its sale. Defendant need not use the sales of excess power to generate profit sufficient to actually satisfy a portion of the operation and maintenance costs.

## CONCLUSION

In conclusion, finding that material issues of genuine fact exist regarding the allocation of power, this court denies defendant's motion for summary judgment in that respect, but grants the motion in all other respects.[4]

2. The 1928 Act mandates that net revenues from the sales of surplus power first be applied towards "the cost of developing such electrical power as that cost shall be determined by the Secretary of the Interior," then towards "the cost of the San Carlos irrigation project" and finally "to payments of operation and maintenance charges...." 1928 Act at 211.

3. In a portion of his affidavit that is unchallenged, Project Engineer Ralph Esquerra states that "[i]t is unusual for Coolidge Dam to generate a surplus of energy. The amount of energy generated has been, on the average, less than the amount of energy necessary to operate the irrigation pumps."

4. The District asks this court to deny defendant's summary judgment motion because defendant failed to submit Proposed Findings of Uncontroverted Facts with its motion, in contravention of RUSCC 56(d)(1). Defendant responds that it filed such findings with its previous motions and therefore relies on them as well as its appendices of record. This court agrees with defendant that a complete factual record about damages is now before it and finds that the District would not be prejudiced without additional Proposed Findings on the part of defendant. Therefore, defendant's summary judgment motion will not be denied on this ground.