**SAN CARLOS IRRIGATION AND DRAINAGE DISTRICT,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant/Cross–Appellant.**

Nos. 95–5105, 95–5091.

United States Court of Appeals,
Federal Circuit.

April 1, 1997.

Rehearing Denied May 12, 1997.

As Corrected on Limited Grant of
Rehearing June 18, 1997.

Riney B. Salmon II, Salmon, Lewis & Weldon, P.L.C., Phoenix, AZ, argued for plaintiff–appellant. With him on the brief was Mark A. McGinnis.

Jeffrey P. Kehne, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC, argued for defendant/cross–appellant. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Martin W. Matzen and Glen R. Goodsell, Attorneys. Of counsel on the brief was Robert Moeller, Office of the Regional Solicitor, U.S. Department of the Interior, Phoenix, AZ.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

MICHEL, Circuit Judge.

San Carlos Irrigation and Drainage District ("SCIDD") appeals from the February 24, 1995 revised final judgment of the United States Court of Federal Claims, *San Carlos Irrigation and Drainage District v. United States,* 32 Fed. Cl. 200 (1994) (damages calculation revised by Order, *San Carlos Irrigation and Drainage District v. United States,* No. 460–86L (Fed.Cl. Feb. 24, 1995)) awarding damages on certain of SCIDD's claims and denying others. The United States (the "government") cross appeals the award of damages. The appeals were submitted for our decision following oral argument on October 10, 1996. Because the Claims Court[1] grant of summary judgment against certain claims was proper and because it correctly interpreted the contract between SCIDD and the government with respect to the other claims and correctly determined damages, we affirm.

## BACKGROUND

The facts giving rise to the litigation are set out in detail in the prior published opinions in this case. *See San Carlos Irrigation and Drainage Dist. v. United States,* 15 Cl. Ct. 197 (1988) ("*SCIDD I*") (summary judgment awarded to the government), *rev'd and remanded,* 877 F.2d 957 (Fed.Cir.1989) ("*SCIDD II*"), *proceedings following remand,* 23 Cl.Ct. 276 (1991) ("*SCIDD III*") (denying government's renewed motion for summary judgment and granting partial summary judgment to SCIDD), *further proceedings,* 26 Cl.Ct. 229 (1992) ("*SCIDD IV*") (denial of government's motion for summary judgment on damages), *further proceedings,* 32 Fed. Cl. 200 (1994) ("*SCIDD V*") (judgment following trial on damages). The history and facts relevant to the present appeal are summarized below.

Congress authorized the construction of the Coolidge Dam across the Gila River in Arizona in 1924 as part of the San Carlos Irrigation Project ("Project"), so as to provide irrigation to the Pima Indian Reservation, as well as to the public and private lands in the area without diminishing the water supply for Indian lands. *See* Act of June 7, 1924, ch. 288, § 1, 43 Stat. 475 ("1924 Act"). The Dam created a reservoir sufficient to irrigate eighty percent of the Project lands, with the balance receiving water from other sources, mainly underground pumped water. Under the 1924 Act, the government entered into a "Repayment Contract" (the "Contract") with SCIDD, a district embracing both the publicly owned and privately owned lands. 1924 Act § 4. The off-reservation irrigators initially were to repay roughly half the Project's construction debt, based on their share of the total acreage, over twenty years, although later legislation essentially forgave this debt. *See* 59 Stat. 469 (1945). The 1924 Act also required off-reservation irrigators to pay a proportionate share of annual operation and maintenance ("O & M") expenses, to be paid annually in advance. 1924 Act § 3.[2]

---

1. For simplicity, the trial court here will be referred to at all times as the Claims Court, even though the later decisions of the trial court occurred after the court had been renamed the Court of Federal Claims.

2. Section 3 of the Act provides in part, "[T]he operation and maintenance charges on account of land in private ownership ... shall be paid annually in advance."

Four years later, Congress authorized the Secretary of the Interior ("Secretary") to develop power at the Dam. *See* Act of June 30, 1928, ch. 138, 45 Stat. 200, 210–11 ("1928 Act"). The 1928 Act authorized the Secretary, again following execution of a repayment contract, to construct a hydroelectric power plant at the Dam. Construction costs for the power plant were to be repaid as part of the Project. The O & M costs for the power plant were to be paid for through the sale of power. The Secretary was authorized to sell, according to the Contract, "surplus" power and apply the "net revenues" from such sale to (i) reimbursement of the costs of developing power, (ii) reimbursement of the costs of the Project and (iii) O & M charges (for irrigation operations) and repairs on the Project. While initially this was an ordinal ranking, later acts merely provided a list of permissible uses for the net revenues. *See* Act of August 7, 1946, ch. 802, § 3, 60 Stat. 895. The 1928 Act also required the Secretary to furnish power for agency facilities, school buildings and irrigation pumps on the San Carlos Reservation at low rates. The surplus power, however, was available for the Secretary to sell on "such terms and for such price as he shall think best." 1928 Act, 45 Stat. at 211.

In 1931, SCIDD entered into the Contract with the Secretary. The Contract outlined the repayment scheme, and contained separate provisions relating to the Project's water and power operations. With respect to water, both "stored and pumped," the Contract stated that the Secretary was required to distribute water "as equitably as physical conditions permit." SCIDD agreed to pay O & M charges, including those for the pumps, as "fixed from time to time by the Secretary," but the obligation of the government to deliver all or some of the water held in the Dam is contested by the parties. It is, however, not contested that any profit from the sale of "excess water," as that term appears in the Contract, was to be applied to reduce O & M charges.

With respect to power, the Contract states the Secretary is to supply at-cost power to buildings and pumps on the San Carlos Reservation, and use any "net" revenues from sale of "surplus" power "in accordance with the plan of [the 1928 Act to] reduce the sum to be paid" by the beneficiaries of the Project. The Contract otherwise did not place any limitations on the Secretary.

In June of 1938, the Assistant Secretary of the Interior executed a Joint Works Order defining the Joint Works to include the Coolidge Dam, San Carlos Reservoir and the electrical generating system. The Order provides that the costs of operating and maintaining the works, except for the electric generation plant at the Dam and the power transmission and distribution system, shall be paid by the Project landowners as provided in the Contract.

The Joint Works operated essentially without moment under these agreements until 1983. Only minor problems were encountered before that time. The Power Division, in addition to generating power, also purchased low cost power from other federal hydroelectric projects and slightly higher priced power from the Arizona Public Service Corporation. However, because of excessive pumping during the life of the Project, the water table had fallen, and thus the demand increased for power to operate pumps to provide irrigation to the lands not covered by the water storage in the Reservoir. The government presented evidence that the demand for groundwater pump power was exceeding the total output of the Coolidge Dam in the years preceding the incidents giving rise to the present litigation.

However, the Dam broke, literally, in October of 1983. On October 1, 1983, a storm caused the San Carlos Reservoir to spill over the spillways, and the gates located in the spillways were inoperable. If the spillway gates had functioned properly, the Reservoir would have held additional water. Also, the spilled water caused the foundation under the electric switchyard to settle, and Project officials were forced to shut down power

---

Section 5 of the Act gives the Secretary authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying the provisions of th[e] Act into full force and effect."

operations. Small spills continued from 1983 to 1985. While the Department of the Interior ("Interior") undertook a major rehabilitation of the power plant, it continued to deliver power by purchasing preferred-rate federal hydro-power ("Parker–Davis" power from dams on the Colorado River) and commercial power, purchased principally from the Arizona Public Service Company.

In May 1982, the Area Director of Interior set O & M rates for fiscal 1984 that incorporated charges for power to operate the pumps. *See* 47 Fed.Reg. 21,926–01 (1982) (notice). Such a proposal had previously been suggested as early as 1953 in a General Accounting Office ("GAO") audit and subsequently in formal opinions of the Comptroller General and Interior employees, but was rejected on instructions from the Senate Finance Committee.

Charges for pumping power during fiscal 1984 through fiscal 1990 were based on estimates of what it would have cost to produce power at Coolidge Dam and to purchase additional power.[3] The 1991 and 1992 rates were based primarily on the cost of Parker–Davis power which at those times was lower than the Coolidge imputed cost rate.

SCIDD filed suit on July 28, 1986 seeking damages for loss of water and hydroelectric power. The Claims Court dismissed the complaint, *SCIDD I,* 15 Cl.Ct. at 203–04, and a panel of this court reversed, determining there was a contractual duty on the part of the government to keep the Dam, spillways, and power generation system in good repair. *SCIDD II,* 877 F.2d at 959–60. On remand the Claims Court held that the government was not liable as a matter of law for the loss of any storable water, on a theory that SCIDD received its "contractual" allocation of water during each year in question. *SCIDD IV,* 26 Cl.Ct. at 230. On the power issue, the Claims Court noted that the government had conceded that SCIDD had an entitlement to "at-cost" pumping power. *Id.* Following a trial, the Claims Court entered judgment for SCIDD in the amount of $667,021 on a claim of $4,673,834 for overcharges.

*SCIDD V,* 32 Fed. Cl. at 202. The award was later revised and final judgment entered for $770,900.

### DISCUSSION

SCIDD appeals both the grant of summary judgment on the damage claim for the loss of water and the damages calculation for the power charges. With respect to the latter, SCIDD asserts the Claims Court erred in two respects by holding: (i) that Interior was entitled to charge the district for replacement power for pumping when the Dam failed to operate properly on account of the government's malfeasance, and (ii) if a charge were allowable, by overstating the charges through the use of the Parker–Davis power rate to define the "cost" of power to SCIDD instead of historical cost of generating power at the Coolidge Dam and through the use of Interior's estimates of electrical pump usage rather than actual pump usage.

The government's cross appeal argues that SCIDD is not entitled to any recovery for excess power charges because it failed to exhaust its administrative remedies within Interior by not adequately participating in the ratemaking process for O & M charges. The government also challenges the propriety of the award of damages for overcharges.

### I.

SCIDD argues that it is entitled to damages for the water lost due to the malfunctioning of the spillway gates, which the prior appeal decided the government was obligated to maintain. Its claim, in essence, is as follows: (i) Interior's Bureau of Indian Affairs breached its contractual duty to maintain the Dam, (ii) as a result of that breach, the Dam stored less water than it otherwise would have, (iii) the 1931 Contract requires all water captured and stored behind the Dam be used for the benefit of the District and Indians, and (iv) the United States is therefore liable for the loss of water that otherwise would have provided benefit to the landowners. Central to SCIDD's argument

**3.** During parts of the period, the O & M cost included both imputed generation costs and transmission and distribution costs, while at other times, the O & M cost only included generation costs.

is (iii), which is supported by provisions in the Contract which state that all delivery of water, even to off-site users, must be "in accordance with law, and for the interest of the Project," and all water "shall be distributed to the lands of the Project as equitably as the physical conditions permit." The Contract generally states elsewhere that "all water and water rights of the San Carlos Project and opportunities connected therewith shall be used for the advantage of the Project."

The government argued in the Claims Court, and again here, that there is a distinction between "excess" water as specified in the Contract and the water required to be supplied under the basic annual allocation. The government argues that "the Repayment Contract makes no mention of any obligation on the part of the Secretary to maximize carryover storage or reserve excess water for the exclusive use of irrigators." All rights in the annual allocation terminate at the end of each year under the Contract, and the government argues that it may allocate excess water (over the annual allocation) "free on an equitable basis" to both Project users and off-Project users (such as other towns or United States agricultural experiment stations). *See* 25 C.F.R. 130.65 (1949) (Secretary has authority to deliver water to off-Project users). Because the parties do not dispute that the SCIDD irrigators received all the water they needed during the years immediately following the spills, the government argues the landowners were not damaged later, in 1990, when the irrigators could have used more water. The Contract also states that "losses in all Project canals shall be borne by the project as a whole." The government therefore contends, relying on *Truckee–Carson Irrigation District v. Secretary of Department of Interior,* 742 F.2d 527, 531 (9th Cir.1984), and *Central Arizona Irrigation and Drainage District v. Lujan,* 764 F.Supp. 582, 589 (D.Ariz.1991), that we should defer to the Secretary's discretion in allocating the water, since the only vested right in the water was that arising from the yearly estimate set in advance

(which, although the estimate itself has been declining,[4] has been met each year).

The Claims Court rejected SCIDD's argument, holding that the government "has not failed to meet th[e] obligation [to provide water], despite the 1988 flood." *SCIDD IV,* 26 Cl.Ct. at 231. We freely review the grant of partial summary judgment on the water claims to determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." R.C.F.C. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The government, as moving party, bears the burden of demonstrating the absence of genuine issues of material facts. *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116, 227 USPQ 577, 581 (Fed.Cir.1985) (in banc).

While recognizing both that the negligent loss of water over the inoperable spillgates is per se not in "the interests of the project" and that, as SCIDD argues, one purpose of federal irrigation projects is to store water in wet years for use in arid years, we hold nonetheless that the grant of summary judgment was proper. However, we do not reach the grounds upon which the Claims Court rested its grant of summary judgment: that the Contract obligated the government only to deliver an annual allotment of water, set each year, and that the government met this obligation every year (i.e., that the annual allocation sets a "cap" for the government's contractual liability). *SCIDD IV,* 26 Cl.Ct. at 231. Rather, we hold that the damages alleged by SCIDD—namely, that it did not receive adequate allocations of water several years after the spills because the gates malfunctioned or that "surplus" water was lost which could have been sold to generate revenue to reduce its O & M charges—are too speculative to create contractual liability on the part of the government under its adjudged duty to keep the spillgates operable.

The general rule in common law breach of contract cases is to award damages

---

4. The water allocation by the Bureau of Indian Affairs for 1983 was 3.0 acre-feet per acre, but only .60 acre-feet in 1990.

sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed. *Estate of Berg v. United States,* 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982). Further, "where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision...." *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969). However, these rules are limited by the proposition that contract law precludes recovery for speculative damages. *Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–63, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)). "[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common law damages, such as the instant case." *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1020 (Fed.Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1996) (quoting *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 713, 720 (1975)). A plaintiff must show that but for the breach, the damages alleged would not have been suffered. *See Standard Havens Prod., Inc., v. Gencor Indus., Inc.,* 953 F.2d 1360, 1374, 21 USPQ2d 1321, 1332–33 (Fed.Cir.1991) (quoting *United Indus. Syndicate, Inc. v. Western Auto Supply Co.,* 686 F.2d 1312, 1316 (8th Cir.1982) ("The fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach.")); *Fawick Corp. v. United States,* 149 Ct.Cl. 623, 626–27 (1960).

■ Here SCIDD admits that the Contract provides that when there is "excess" water in a given year, the Secretary, if in accordance with law and for the interest of the project, may "supply water for irrigation and other purposes to the State or its subdivisions, municipalities, towns, and villages ... public institutions, and department and agencies or enterprises of the United States .... upon terms to be fixed by the Secretary." Nothing in the Contract requires the Secretary to earn a profit from the supply of water to off-site users and apply this profit against SCIDD's O & M charges. The Secretary further retains the discretionary power to store water only as safety conditions permit, and water in the Dam may evaporate naturally. SCIDD also admits that the allocation of water was 3.0 acre-feet per acre in 1983 and, as stated in its opening brief, "generally remained at this level through 1988." Implicit in SCIDD's argument that the water which was in the Dam during the "wet" years in the early 1980's would have been available in the "dry" years of 1989 and 1990, is the uncontroverted proposition that water delivery was adequate to meet—and perhaps in excess of—demand until 1989.

These facts being so, SCIDD has not shown that it would have received any material benefit with respect to the water had the spillgates been operable. SCIDD would be unable to prove that but for the breach, more water would have been directed to its use *nine years* after the breach. Too many contingencies—including, most importantly, the discretion of the agency to dispose of excess water—exist in the causal chain from the government's breach to the asserted lack of water in 1989–90.

■ We further disagree with SCIDD's contention that failure to enter damages against the United States makes this court's prior decision in *SCIDD II* "hollow." Not every injury resulting from a breach of contract is remediable in damages. *Wells Fargo,* 88 F.3d at 1022 (citing *Globe Ref. Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903)). Had the government failed to meet its annual allocation in the years immediately following the flood, then perhaps SCIDD would have been able to trace the lack of water directly to the government's malfeasance. Perhaps even if the government had set a significantly lower allocation rate immediately following the flood, that too might be a cognizable injury which could fairly be said to have stemmed from the breach. Here, however, SCIDD's allegations do not show that the malfunction of the spillgate was the "but for" cause of its injury. Our decision in *SCIDD II,* on appeal after the initial grant of sum-

mary judgment in the Claims Court, adjudicated only the duty of the government to maintain the spillways and the electrical generation system. 877 F.2d at 960. The opinion stated that if SCIDD was able to prove that the government breached its duty to maintain the dam, "general damages *may* be recovered." *Id.* The decision explicitly left open questions other than the duty to maintain the project: "The questions of breach, causation and damages, which were not addressed below, must obviously await a trial on the merits." *Id.* at 960–61. That the Claims Court then proceeded to enter summary judgment on the damages issue after our reversal on the interpretation of the Contract in no way vitiates our prior holding that the government had a duty to keep the spillgates operable.

## II.

■ A. The government cross appeals the award of $770,900 damages to SCIDD. That award was based on the Claims Court ruling that, although Interior was permitted under the Contract to begin charging for ground water pumping, instead of funding it with power division revenues (since the power plant was not operational), Interior's projection of pumping power costs (incorporated into the O & M charges) was excessive. The government concedes that it has an obligation to provide pumping power at cost, *see SCIDD IV,* 26 Cl.Ct. at 230, but contends that the O & M rate, as set by the government, determines the "cost." The government argues that because SCIDD did not exhaust its remedies with respect to the O & M ratemaking notice-and-comment procedure by not proceeding with an administrative appeal from the decision of the Area Director in setting the rates to the Commissioner of Indian Affairs (or, now, the Assistant Secretary of Interior for Indian Affairs), the Administrative Procedure Act ("APA") bars SCIDD from obtaining review of "final agency action" under 5 U.S.C. § 704 (1994). The government maintains that the Contract requires SCIDD to follow administrative procedures to challenge the O & M rates.

■ Interpretation of terms in a contract is an issue of law which we review de novo.

*Samsung Elec. Am. v. United States,* 106 F.3d 376 (Fed.Cir.1997) (citing *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir.1993)). We disagree with the government's interpretation. While the Contract does provide that the O & M charges shall be "announced from time to time by the Secretary of the Interior," such charges are limited by the other sections of the Contract, as the government concedes, including the "Operation and Maintenance" section, which provide that the charges for O & M shall reflect the true cost of operating and maintaining the project. Nothing in the Contract implies or states that the APA applies to the determination of the "cost" of replacement power. SCIDD's claim, under the Tucker Act, 28 U.S.C. § 1491 (1994), is that the government breached its acknowledged duty to provide power at cost. The government has pointed to no compelling evidence in the Contract—besides the very vague general authority of the Secretary to promulgate regulations under the statutes creating the Project and the Contract—which incorporates the regulatory appeals process into SCIDD's rights under the Contract. The Contract does not speak to the determination of "cost," and there is no suggestion, and certainly no clear statement, that SCIDD must protest that determination through the regulatory ratemaking process before asserting a breach of the Contract.

■ While we acknowledge the authority cited by the government that rate making is generally inherently a policy decision better left to an agency, *see, e.g., United States v. Jones,* 336 U.S. 641, 652–53, 69 S.Ct. 787, 793–94, 93 L.Ed. 938 (1949), and that the doctrine of primary jurisdiction requires that the agency redetermine rates in cases where a court determines the agency has abused its discretion, *see, e.g., Oceanic S.S. Co. v. United States,* 218 Ct.Cl. 87, 586 F.2d 774, 793 (1978), here SCIDD's claim is decidedly different. SCIDD asserts it was deprived of its contractual right to pumping power at cost. This discrete determination is amenable to judicial resolution. We see no reason, prudential or jurisdictional, to bar SCIDD from presenting this claim against the government in the Claims Court. *See Allied–General*

*Nuclear Services v. United States,* 839 F.2d 1572, 1575 (Fed.Cir.1988) ("The exhaustion doctrine is not, strictly speaking, a matter of jurisdiction."); *National Treasury Employees Union v. King,* 961 F.2d 240, 244 (D.C.Cir.1992) (if statute does not require exhaustion, requirement is committed to judicial discretion); *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961) ("Unless made a prerequisite to suit by statute, binding regulation or contract, the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the discretion of the court.").

**■** B. The question then becomes whether Interior and the Bureau of Indian Affairs could charge for pumping power *at all* when the Dam was no longer generating power due to the flood. SCIDD argues the intent of Congress was that the power generating facility at the project was to be self-sustaining, and the only charges for which SCIDD was ever responsible were the construction charges for the project and O & M charges for the upkeep of the irrigation system. Thus, the construction charges were the consideration for the delivery of power. It bases this argument first on the language of the 1928 Act which describes the electric plant as "incident" to the Project; from that SCIDD maintains that construction and O & M charges were only to pay for the building of the plant and maintenance of the irrigation system, not for delivery of "non-surplus" power to the landowners. Had the power plant been operational, SCIDD maintains, sale from "surplus" power would have generated sufficient revenue to cover the charges for power generation levied against it. Thus, SCIDD maintains it is being charged for the costs of the government's failure to properly maintain the Dam, because the 1928 Act, on SCIDD's interpretation, contemplated that revenues from sale would pay for the normal and ordinary operation of the power plant. SCIDD further bases its argument on the "legislative history" of the 1928 Act, primarily a letter from John Truesdell of the U.S. Indian Irrigation Service to Congress, and the general intent garnered from the statute and Contract. In particular, SCIDD notes that Congress was explicit about the cost of

charging for power to the Indians on the San Carlos Indian Reservation.

Continuing this line of argument, SCIDD claims that since the power plant now fails to generate power as a result of the failure of the government to maintain the Dam, SCIDD is entitled to either general or consequential damages for cost of the replacement power which had to be purchased from outside sources. It argues that it was "in the ordinary course of events," *see* Restatement (Second) of Contracts § 351(2)(a), for the government to require "cover" power to remedy its failure to operate the Dam. Alternatively, SCIDD argues it was forseeable at the time of contract formation that if the Dam overflowed the power plant would shut down and it would be necessary to purchase other power. In essence, SCIDD maintains it had an expectation interest in the continued operation of the power plant sufficient to provide pumping power and adequate economic return to meet its operating expenses. Any loss from the lack of operation of the power plant (here the roughly $4.7 million in power charges paid by the district landowners to the government) should, in SCIDD's view, be borne by the government.

The government responds by arguing that the costs of power for operating groundwater pumps are properly chargeable to SCIDD as O & M expenses under the language of the Contract, which states, "[A] surcharge may be placed against all of the lands of the project for paying the cost of operating and maintaining the pumps and equipment use of pumping drainage or irrigation water." It takes the position that power for pumping is an integral part of "operating" the pumps.

The government further argues that the Bureau of Indian Affairs has always had authority to charge for pumping power but had not done so in the past because it had received sufficient revenues from the sale of excess power to pay for the power component of the O & M expenses. It responds to SCIDD's argument that the surplus power was meant to make the plant self-sustaining by arguing that the Secretary has discretion to sell the power at any rate he or she "thinks best," 1928 Act, 45 Stat. at 210, and that there is no guarantee in the Contract

that the revenues from the sale of power from the plant will cover the cost of power for pumping. The government argues that SCIDD recognized this authority of the government to charge prior to the litigation in a letter to the government acknowledging that some of the costs of power for pumping had been paid by the district.

SCIDD's arguments regarding the language and history of the statute are unconvincing. The word "incident" does not sufficiently convey congressional intent that the project was meant to be self-sustaining and that the government could not charge for power as part of the ordinary O & M expenses of the pumps. The only piece of legislative history contemporaneous with the passage of the 1928 Act, the Truesdell letter, is hardly a certain source of the intent of the 1928 Congress. Rather, Truesdell was drawing his own conclusions based on what he perceived as silence in the statute: "If Congress had had any thought that the power used for pumping project water for irrigation would be charged for in any way ... it would have specifically mentioned that fact...." SCIDD's other "legislative history" consists of testimony in hearings for appropriations bills which occurred years after the 1928 Act, and which states nothing more than the bare proposition that "[r]evenues collected from the sale of electrical energy are appropriated to cover the costs of operation and maintenance of the power system." Hearings on H.R. 4590 Before the Subcomm. on Appropriations, 77th Cong. 220 (1942) (statement of Mr. Greenwood). Such a statement does not prove SCIDD's argument that the government was obligated, by statute or contract, to generate sufficient revenues from sale of excess power to cover all costs of power for pumping.

Rather, the granting of discretion to the Secretary to set the price for sales of power to other users evidences that the statute does *not* assure that there will be sufficient revenue to provide for free pumping power. The government's position in maintaining that the Secretary was in effect entitled to give the power away is both an exaggeration of the terms of the Contract, which requires that the power be "sold," and contrary to the general principle of discretion (since presumably the Secretary is required to act reasonably in setting the rate). However, the basic principle behind the government's interpretation is valid and controlling: namely, that nothing in the 1928 Act or the Contract provides an obligation on the part of the government to provide free (or in the government's terms, subsidized) power to SCIDD. All that the Contract obligates is: (i) power be provided at cost, (ii) any revenue from the sale of power be applied to reduce the costs of power for the pumps (i.e., that the project be self-sustaining when possible), and (iii) in return for participation in the payment of construction costs (a requirement later essentially forgiven by legislation), that the government provide the pumps and irrigation system. We agree with the government's contention that providing power for the pumps is properly considered part of "operation" of the pumps. There is no statement that free power to run the pumps is assured in the Contract or the Act.

C. The Government next argues that if the Bureau of Indian Affairs was entitled to charge for the pumping power at "cost," SCIDD cannot contest the charges assessed against it. Relying on *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), the government argues we must defer to Interior's choice of method from a variety of methods for determining the projected cost of power for the groundwater pumps. Essentially, the government argues that because it must estimate the "cost" of power for future years in advance under the contract, it is entitled to determine what constitutes "cost" without judicial intervention. Accordingly, the government argues the Claims Court erred in using the Parker–Davis power rate as the measure of damages; rather the government submits that it should be allowed to charge based on the imputed cost of power production for certain years (1984 through 1990), while charging based on the Parker–Davis rate for other years (1991 to 1994).

The government has acknowledged and conceded its obligation to provide power at cost under the contract. *See SCIDD IV*, 26

Cl.Ct. at 230. As discussed more fully below in the context of SCIDD's challenge to the damages rate, the government, while obligated (without objection from SCIDD) to use advance estimates of future power costs, may not choose an unreasonable methodology for selecting the rate used, even if deference is accorded to its chosen rate. Here, imputed cost was not a reasonable and available rate for the government. The power plant was not operational, and therefore the government cannot use projections of what it would have cost to generate power at the plant to arrive at a higher charge than the cost of replacement Parker–Davis power. Although SCIDD's position during the litigation regarding which was the lower rate (imputed cost v. Parker–Davis) from 1984 to 1990 is unclear, the government is not now entitled to use a higher rate than the cost of available Parker–Davis power. Since the price of replacement power is easily ascertainable, it is unreasonable for the government to ask for use of a higher, estimated rate.

D. Finally, SCIDD maintains that the Claims Court erred in assessing the damages owed to SCIDD due to the government's overcharges from 1984 to 1994. SCIDD claims that the figure used by the Claims Court as the actual cost of the power is incorrect for two reasons: (i) the Bureau of Indian Affairs was charging SCIDD for the cost of replacement Parker–Davis power rather than basing it on the historical average generating costs at the damaged Coolidge Dam power plant over the ten years prior to 1983 (and diverting the profits to a create a "fund" of money in New Mexico) and (ii) rather than using actual pump electrical usage, the Bureau of Indian Affairs was charging for pumping power based on advance estimates of pump electrical usage.

With respect to (i), SCIDD asserts the annual average power cost for the decade prior to the first overflow was $70,113, while the government's charges for the power in the years after charging began in 1984 ranged from $488,000 to $1,200,000. It claims it was thus awarded approximately $3.2 million less of a refund than it deserved ($770,000 instead of $3,902,591). This discrepancy, it theorizes based on the trial testimony of Ralph Esquerra, a Bureau of Indian Affairs employee and former engineer at the project, was used to pay for repairs to the power plant. SCIDD's central contention is that it is being charged for the loss of low-cost power due to the government's breach and the overcharge should therefore be refunded under the Contract.

As for (ii), SCIDD asserts its damages should have at least been $1,842,536 instead of $770,900, because the charge should have been based on actual pump electric usage rather than Bureau of Indian Affairs advance estimates. The Bureau of Indian Affairs charges for O & M two years in advance, pursuant to the Contract, to permit the District sufficient time to levy assessments and for purposes of its own budget. SCIDD argues that, assuming it was proper to use the Parker–Davis rate, Interior erred by not refunding any use that fell short of the advance estimate, thereby effectively charging SCIDD between $0.0192 per kilowatt-hour (kwh) and $0.259 per kwh in contrast to the actual Parker–Davis rate of $0.02712 per kwh. Recalculating the actual usage with the actual rate, SCIDD arrives at the $1,842,536 damages amount.

The government responds by arguing: (i) the Coolidge Dam imputed cost was not necessarily lower than the Parker–Davis rate, since SCIDD's estimate of the historical cost does not contemplate the high inflation rate which occurred in the 1970's and 1980's resulting in an insufficient estimate; (ii) the historical rate was too low because it did not reflect maintenance costs which had been deferred and would have been necessary even if the overflows had not occurred; (iii) even if cash charges exceeded outlays, the "fund" alleged by SCIDD to have been created with the overcharges is permitted under 25 U.S.C. § 385c (1994), which allows for reserves to finance major repairs, and "SCIDD has made no showing that the Project misallocated funds" from the accounts nor shown that the funds are not available for the uses allowed by Congress; (iv) SCIDD waived objection to the Parker–Davis rate since it preferred that rate (over imputed historical cost) in its submissions to Interior during the ratemaking process and waived objection to the use of estimated

pump usage by never requesting a change to retrospective billing for O & M; and (v) Parker–Davis was "the least expensive firm source of power available" in 1990 when Interior decided to use the rate.

With respect to the rate for power, the Claims Court was correct in using the Parker–Davis rate for the entire damages period. Although Interior used several rates for power during the eleven year period (the imputed cost of Coolidge Dam power, Parker–Davis power, and the projected cost of purchasing commercial power after the anticipated divestiture of the power division of the Project), as discussed above, any rate other than the Parker–Davis rate was an abuse of discretion by the Secretary, even if deference is accorded to the Secretary under *Chevron*. Because the parties do not dispute the obligation on the part of the government was to provide pumping power at "cost," and because we hold that the government may charge for power but only at "cost," the sole question remaining is "What was the cost of the power available after the power plant became inoperable?" Without power available from the Coolidge plant, the least expensive power throughout the damages period was Parker–Davis power. SCIDD is not entitled to guaranteed power production from the Coolidge plant under the Contract; thus, its argument that imputed cost must be used so that SCIDD will not be absorbing damages from the government's breach rests on a false premise. The government is not, as SCIDD argued "escap[ing] responsibility for its own fault," because SCIDD has no right to the production of a certain amount of power from the Project plant. SCIDD's only extant damage claim is that the lowest price available to the government be passed along to them.

■■■ Moreover, SCIDD itself argued to the Claims Court that "if it is to be charged for power it should pay no more than the *actual* average replacement cost of power." *SCIDD IV*, 26 Cl.Ct. at 231 (emphasis added). The Claims Court, in its order revising damages, *San Carlos Irrigation and Drainage District v. United States*, No. 460–86L (Fed.Cl. Feb. 24, 1995), noted that it had denied summary judgment on the basis of SCIDD's argument that the imputed historical cost of the Coolidge power was incorrect and that replacement cost should govern the damages calculation. Thus, even if there was a colorable argument that the Parker–Davis rate should not apply, the Claims Court did not abuse its discretion in concluding that SCIDD was barred by judicial estoppel from relitigating the issue. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1564 (Fed.Cir.1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.") (citing *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895)).

■■■ On the issue of the charge for estimated rather than actual power usage, the terms of the Contract again govern the resolution of SCIDD's claim. The Contract provides, "The Secretary of the Interior will give notice to the District of the amount of charges to be paid annually in sufficient time to permit the District to make the annual tax levies, or toll charges, in order that the District may comply with the laws of the State of Arizona relative to the levy and collection of taxes by irrigation districts." The Contract therefore provides for charges in advance of use, necessarily implicating the use of estimates.

The government represents in its opening brief that "when O & M collections exceed expenses for a given year, the balance is retained in the Irrigation Division account to meet future expenses." Thus, the government maintains that any overcharges merely result in prepayments by irrigators for future irrigation O & M expenses. The government represented that, following an audit to uncover transfers made in error, funds have only been transferred from the irrigation division, which has collected the O & M charges for the pumps (including power for pumping), to the power division for *actual* power used during the entire period.

The Contract clearly contemplates advance assessment of charges based upon estimates; such a provision makes sense since the project needs funds to cover its current operating expenses. Moreover, so long as power is only charged for as used, the proper balance of such funds remains credited to SCIDD for its future use. Nor is a two year advance assessment period unreasonable in light of the circumstances presented by operation of the power plant. The only issue potentially remaining, then, is whether the proper *rate* was charged when the irrigation division purchased power from the power division. Since no allegation of an improper transfer rate appeared in SCIDD's damages calculations as suggested to the trial court and the issue was not addressed by the trial court, we decline to rule on that issue or its possible consequences for damages in this appeal.

## CONCLUSION

Although in *SCIDD II* we held that the government had a duty to maintain the Project, a breach of that duty can entitle plaintiff to damages only where there was a contractual expectation interest flowing to SCIDD. Here, the only discernible interest was to receive power at cost and as available. Although SCIDD urges the implication of other contractual obligations from the "plan" of the Contract and the 1924 and 1928 Acts, the language of these instruments belies such an interpretation. The revised final judgment of the Court of Federal Claims is therefore affirmed in all respects.

*AFFIRMED.*

## COSTS

SCIDD shall bear costs.